Donald W. KREUZER, D.M.D., Appellant,

v.

AMERICAN ACADEMY OF PERIODONTOLOGY, et al.

No. 83–1394.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1984.

Decided June 1, 1984.

As Amended June 26, 1984.

---

John F. Dienelt, Washington, D.C., with whom Arthur I. Cantor and Warren Josephson, Washington, D.C., were on the brief for appellant.

Peter M. Sfikas, Chicago, Ill., with whom Robert L. Green, Washington, D.C., was on the brief for appellees, American Dental Ass'n.

James W. Hathaway, Chicago, Ill., a member of the Bar of the Supreme Court of Ill. pro hac vice, by special leave of the court with whom Mark W. Foster, Washington, D.C., was on the brief for appellees, American Academy of Periodontology.

Barry Grossman and Stephen F. Ross, Dept. of Justice, Washington, D.C., were on the brief of amicus curiae urging reversal.

Before TAMM and GINSBURG *, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

This private antitrust action challenges the legality of one of the American Academy of Periodontology's ("AAP" and "Periodontists") requirements for active membership, specifically the "limited practice requirement". The plaintiff-appellant is Donald W. Kreuzer, D.M.D., a periodontist who practices in the District of Columbia. The defendant-appellees are the AAP and the American Dental Association ("ADA"). Dr. Kreuzer contends that the limited practice requirement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act.[1]

On motions of the Periodontists and the ADA, the District Court held that Dr. Kreuzer had failed to establish that a conspiracy existed between the Periodontists and the ADA to restrain trade and granted summary judgment in favor of the ADA.[2] In addition, the District Court held that the

limited practice requirement, tested under the rule of reason, was a reasonable restraint of trade because "there is no evidence of anticompetitive intent" and granted summary judgment in favor of the Periodontists.[3]

Dr. Kreuzer has appealed presenting four issues for resolution by this court: (1) whether the District Court applied the correct standard in assessing the complicity of the ADA; (2) whether the District Court should have held the limited practice requirement illegal *per se;* (3) whether the District Court correctly applied the rule of reason analysis; (4) whether summary judgment was appropriate given the record. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

The dental profession is composed of general dentistry and eight dental specialties.[4] Periodontics is that recognized dental specialty concerned with the treatment of diseases of the tissues surrounding the teeth. To practice periodontics or any dental specialty, one need only be a graduate of an approved dental school and licensed as a dentist.[5] A licensed dentist may perform any dental process. Thus, many general dentists become proficient in one or more dental specialties by virtue of continuing education or practical experience. Brief of AAP 6.

Dr. Kreuzer is a licensed dentist. In addition, he holds a certificate in periodontology from the graduate program at the University of Pennsylvania, an ADA accre-

---

* Circuit Judge Ginsburg did not participate in this opinion.

1. Sherman Antitrust Act § 1, 15 U.S.C. § 1 (1976) provides in pertinent part:

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

2. The District Court opinion granting summary judgment to the ADA is reported at 516 F.Supp. 1034 (D.D.C.1981).

3. The District Court opinion granting summary judgment to the Periodontists is reported at 558 F.Supp. 683 (D.D.C.1983).

4. These specialties are endodontics, orthodontics, pedodontics, oral pathology, oral surgery, dental public health, prosthodontics and periodontics. Holmquist Dep. Ex. 21, R.E. at 237–38.

5. Dentists are licensed by state boards of dental examiners. *See, e.g.,* D.C.Code §§ 2–1201 *et seq.* There is no national licensing authority for dental specialties such as periodontics, and few, if any, states license periodontists.

dited dental school. Dr. Kreuzer also obtained special training at the University of Pennsylvania in periodontal prosthesis.[6] Periodontal prosthesis involves the restoration and prosthetic treatment of advanced periodontal disease. Periodontal prosthesis developed as a subfield of periodontology concerned with saving teeth that might otherwise be extracted due to advanced periodontal disease. Periodontal prosthesis is not recognized by the ADA as a dental specialty. Holmquist Deposition Exhibit ("Dep.Ex.") 2, Record Excerpts ("R.E.") 203.

The ADA is the most prominent national organization for dentists. Among the many activities of the ADA are promulgation of its Principles of Ethics, definition of dental specialists, accreditation of dental schools and graduate programs and recognition of specialty organizations such as the AAP. Swanson Dep.Ex. 2, R.E. 261–62; 3–4, 6–7, 9, R.E. 265–66. Because of its role in defining and recognizing dental specialties, the ADA also serves as a mediator and arbiter of the scope of dental specialties. Coady Dep.Ex. 4, R.E. 126–131.

The AAP is a non-profit corporation organized "to advance the art and science of periodontology, and by its application, maintain and improve the health of the public." Holmquist Affidavit ("Aff.") 2, R.E. 32. The AAP's principal functions are publication of the *Journal of Periodontology* and various consumer education materials, conduct of an annual scientific session, issuance of scholarships and grants, formation of standards for advancing training and formulation of procedures to facilitate reimbursement of practitioners by third-party payment plans. Holmquist Aff. 2 at ¶ 5, R.E. 32. In addition, the Periodon-

tist's association publishes an annual directory of its members.

The AAP has eight membership classifications. The "highest" degree of membership is active membership. 558 F.Supp. at 683. To qualify for active membership, an applicant must meet several criteria including being "[e]thically qualified as a specialist in periodontics according to the requirements of the American Dental Association." Bylaws of the AAP, Ch. I, § 2(a)(i), R.E. 195. To meet this criterion, a dentist must be educationally qualified in the specialty of periodontics according to the ADA, and must "limit [...] his practice exclusively to the special areas approved by the American Dental Association" ("the limited practice requirement"). ADA Principles of Ethics, § 18, R.E. 155 (emphasis added). The ADA's Council on Judicial Procedures, Constitution and Bylaws, whose responsibility it is to interpret that body's Principles of Ethics, has ruled that the practice of periodontal prosthesis is not within the definition of periodontics. Holmquist Dep.Ex. 2, R.E. 203. Therefore, a dentist who in part practices periodontal prothesis does not limit his practice to periodontics as required by the AAP and is ineligible for active membership in the AAP.[7]

All members of the AAP are entitled to certain benefits. Active members, however, receive additional benefits. The economic value of these additional benefits has been a contested issue in this case.

An active member is entitled to the additional benefits of the right to vote, hold office, and serve on standing committees in the AAP. R.E. 313. These rights make possible opportunities for professional development which are likely to enhance a professional reputation and lead to a higher

---

**6.** The graduate periodontics program at the University of Pennsylvania is a two year program. Students such as Dr. Kreuzer who also receive training in periodontal prothesis, however, follow a three year training program. Cohen Dep. Ex. 30, R.E. 133–152.

**7.** Under the Bylaws of the AAP, such a dentist who does not exclusively practice periodontics may join the AAP as an associate member. As-

sociate members are granted all privileges of active membership except the right to vote, to make nominations, and to hold office in the AAP. In addition, an associate member is listed in a different manner than an active member in the membership directory. Bylaws of the AAP, Ch. I, § 2(c), R.E. 196. As set forth *infra*, this is a significant difference. See infra pp. 1483–1484.

earning capacity. Cohen Dep. 136. In addition, active members are listed in the AAP membership directory as specialists. AAP members are listed in the directory alphabetically and by geographic region. Alongside each name appears a numerical code and a letter or letters. The numerical code denotes the membership category. Active members are designated by the code "00", while associate members are designated by the code "10". Plaintiff's Brief, Exhibit C (Excerpt from 1979 Directory of the Members of the AAP) 1, R.E. 317. The ADA takes no part in the publication of the directory.

The membership directory is used frequently to make referrals and generally persons who do not have a "00" code are automatically excluded from consideration. Mendelsohn Dep. 9–13; Cohen Dep. 133–34. This inability of dentists who *in part* practice periodontics to become active members and to obtain referrals allegedly has a particularly adverse impact on Dr. Kreuzer. The District Court noted that because of "the unusually transient nature of the Washington metropolitan population, referral business is of particular importance to those who practice here as does plaintiff." 558 F.Supp. at 685.

Dr. Kreuzer applied for active membership in the AAP in 1975.[8] A standing Membership Committee of the AAP screens membership applications and presents its recommendations to the annual General Assembly. The Membership Committee circulates a "confidential list" to all active members of the AAP in order to solicit any comments on the applicants. Bylaws of the AAP, Ch. I, § 4, R.E. 196–97. *See generally* Formicola Dep. 16–31. Two active members who practice in the District of Columbia challenged Dr. Kreuzer's application on the grounds that he did not limit his practice to periodontics. Ho-

len Dep. 40–41, Brief for Kreuzer, at 17; First Kreuzer Aff. ¶ 7, R.E. 36–37. After receipt of these complaints and further inquiry, the Membership Committee determined that Dr. Kreuzer did not limit his practice and therefore his name was not recommended to the 1975 General Assembly for active membership.[9]

Dr. Kreuzer objected to this decision and was granted a special hearing before the Membership Committee prior to the 1976 General Assembly meeting. Kreuzer Dep.Ex. 22–23, 26, R.E. 255–59. The Membership Committee decided after the hearing to recommend Dr. Kreuzer to the General Assembly for active membership. Formicola Dep. 90–91, 104–111; Holmquist Dep. Ex. 30, R.E. 239. The 1976 General Assembly, however, voted to refer the issue of those periodontists who also practice periodontal prosthesis to a special task force. Largely because the General Assembly had made this determination to defer further consideration of the role of those practicing periodontal prosthesis, it voted to deny Dr. Kreuzer active membership. Formicola Dep.Ex. 30, 120–121, R.E. 192–93.

Dr. Kreuzer requested his application remain pending. Before the special task force could present its recommendations on periodontal prosthesis to the 1977 General Assembly this suit was initiated.[10] No further action has been taken on Dr. Kreuzer's membership application. Therefore, his application may technically still be pending.

After what the District Court referred to as "mountainous discovery", the ADA and the AAP separately filed motions for summary judgment. In June 1981, the District Court held that "plaintiff has not established the requisite proof of an agreement in order to join ADA as a codefendant in this action." 516 F.Supp. at 1040. The

---

**8.** Dr. Kreuzer, as a student, had previously been an affiliate member of the AAP. He applied for active membership when his affiliate membership expired. Kreuzer Dep. Ex. 2, R.E. 241–42.

**9.** The Membership Committee did recommend Dr. Kreuzer for associate membership. This

recommendation was accepted by the General Assembly. Kreuzer Dep. Ex. 14, R.E. 247–251.

**10.** The task force recommended retention of the limited practice requirement. This was accepted by the 1978 General Assembly. Holmquist Dep. Ex. 7, R.E. 206–210.

court acknowledged that "there is documentation of examples of communication between the ADA and the AAP, over a long period of time and also at the time of the Kreuzer application." *Id.* The court concluded, however, that because the communications never specifically mentioned Dr. Kreuzer or his membership application, "[t]he exchanges of information ... amount to no more than permissible communications between the ADA and the AAP." *Id.*

In March 1983, the District Court granted the Periodontist's motion. Because the AAP's limited practice requirement had a "non-commercial purpose" and because the AAP is a professional organization, the District Court held that the limited practice requirement was not *per se* illegal, but rather should be tested under a rule of reason analysis. 558 F.Supp. at 684. In conducting its rule of reason analysis, the District Court concluded that "there is no evidence of anticompetitive intent—only a philosophical difference of opinion...." *Id.* at 686.

## II. ANALYSIS

■ The framework for analysis of a claim brought under Section 1 of the Sherman Act is all too familiar and requires only a brief reiteration here. Section 1 prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (1976). Although the statute speaks in terms of *every* concerted restraint, the courts have long interpreted this language to prohibit only concerted activity which *unreasonably* restrains trade. *See, e.g., Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). This judicial gloss on the statute makes necessary a bifurcated analysis whenever a court considers a Section 1 claim. The threshold analysis requires a determination of whether some form of joint action exists to satisfy the contracts, combinations, or conspiracy requirement. It is only after concerted

action is found that a court need proceed to the second part of the analysis—whether the concerted activity is an unreasonable restraint of trade.

### A. Joint Action

Dr. Kreuzer alleges that the ADA and the AAP conspired to restrain trade in violation of Section 1. Two assertions are made to support this allegation. First, appellant points to a long record of collaboration over the years between the ADA and the AAP. Based on this, Dr. Kreuzer asks us to infer that the ADA and the AAP must have also consulted on his membership application. Second, appellant identifies certain specific contacts between the ADA and the AAP which occurred during the pendency of his membership application that he contends indicates a conspiracy to deny him active membership in the AAP.

#### 1. *General Contacts*

The District Court found that Dr. Kreuzer had established a pattern of regular contact between the ADA and the AAP. This contact included general correspondence, communication and consultation on a number of specific matters and a regular exchange of information and data. The AAP has incorporated the ADA Principles of Ethics as its own and the AAP has on occasion sought to ascertain how the ADA interpreted particular ethical problems. Neither the ADA nor the AAP denied these contacts. 516 F.Supp. at 1038–39.

Appellant sought to convince the District Court that these contacts evidenced a conspiracy to restrain trade and to restrict competition. Yet the District Court ruled that Dr. Kreuzer has not shown by these general contacts that the ADA and the AAP had reached any sort of agreement. In fact, the court found that this was "only the type of permissible exchanges of information commented on in other cases." 516 F.Supp. at 1038–39 (citations omitted).

#### 2. *Specific Contacts*

The District Court felt that Dr. Kreuzer's allegations of specific contacts be-

tween the ADA and the AAP during the pendency of his membership application raised "more serious inferences and questions". 516 F.Supp. at 1039. There are primarily two such instances of specific contact.[11] The first such contact involved an inquiry made by Ms. Holmquist, Executive Secretary of the AAP, to Elliot Dunn, Secretary of the ADA Council on Judicial Procedures, Constitution and Bylaws. The second such contact involved a letter from Dr. Sugarman, President of the AAP, to the ADA seeking advice on how the limited practice requirement should be applied in certain specific situations.

At the April 30, 1976 meeting of the AAP's Executive Committee, the Executive Secretary of the AAP, Ms. Holmquist, made the following statement:

> In pursuing what we ought to do about Dr. Kreuzer, we did some of the leg work about asking the ADA Council on Judicial Procedures, the ADA Council on Constitution and Bylaws, how they would interpret this, because since our Bylaws tie us to the ADA, we wanted to be certain that the ADA would interpret it in a particular way, and I put the question very squarely to Elliot Dunn, Secretary of that Council, and he brought it to the Council and he came back to me with the answer, which was that if a man did restorative care routinely in his practice, the Council would not consider that he was ethically qualified to announce as a periodontist.

Exhibit H to Plaintiff's Brief, R.E. 322–23.

On January 5, 1977, Dr. Marvin Sugarman, then President of the AAP, wrote a letter to the ADA's Council on Judicial Procedures, Constitution and Bylaws. Swanson Dep.Ex. 10, R.E. 267–85. This letter contained two questions regarding the limited practice requirement. The first question asked whether a dentist who holds himself out to the public as a specialist in periodontics "may ... engage in the practice of permanent restorative dentist-

ry...?" The second question inquired whether a periodontist may refer patients needing essential restorative procedures to a dentist selected only to perform that restorative work. Neither Dr. Kreuzer nor his application for active membership were referred to in this letter. Attached to the letter was a background paper on periodontal prosthesis prepared by the AAP. Again Dr. Kreuzer was not named in the paper. Appended to the background paper was a list of AAP members trained in periodontal prosthesis. Dr. Kreuzer's name was one of twenty that appeared on that list. By letter of March 4, 1977, Dr. Bernard Conway of the ADA replied to Dr. Sugarman's questions. Swanson Dep.Ex. 11, R.E. 286. He answered the first question in the negative and reported that he lacked specific factual information to answer the second question. Dr. Conway did not refer to Dr. Kreuzer or his membership application.

The District Court concluded that this abstract opinion was insufficient to establish an agreement between the ADA and the AAP to restrain trade. The court held that "[n]othing indicates that the ADA had any involvement with the limitation of practice requirement the AAP applied to Kreuzer." 516 F.Supp. at 1039.

### 3. *Discussion*

One of the difficulties in determining whether a conspiracy to restrain trade exists is that they are rarely evidenced by explicit agreements. Courts accordingly have allowed such conspiracies to be proved by "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). Two Supreme Court decisions sketch the outlines of the minimal evidence necessary for finding the threshold Section 1 requirement of concerted action.

---

**11.** In addition, the AAP apparently has furnished the ADA with all copies of correspondence between appellant or his attorneys and the AAP. Swanson Dep. Ex. 13, R.E. 287. This, however, apparently did not occur until after initiation of this law suit.

In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), eight motion picture distributors with 75 per cent of the feature film market had made identical modifications in their contracts with two Texas theaters. Plaintiffs alleged that the distributors had jointly limited the terms on which they would license films. There was, however, no evidence of any direct agreement among the distributors. The Supreme Court upheld a finding of an agreement stating that, "in the circumstances of this case such an agreement ... was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226, 59 S.Ct. at 474. The Court also noted that the distributors had failed to deny the conspiracy and had not offered an innocent explanation for their actions. *See also American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

But in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the Supreme Court upheld a verdict that film distributors had not conspired to deny a suburban exhibitor film rights. The Court noted that there existed sound economic reasons which independently supported each distributor's action; there was no evidence that the defendants knew of each other's actions; and the distributors specifically denied any collaboration. The Court stated: "Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." *Id.* at 541, 74 S.Ct. at 541.

■ In *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the Court further explored the limits of what constitutes an antitrust conspiracy. In *American Tobacco* the Court suggested that "a unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement" must be found to support the conclusion that there is a conspiracy. *Id.* at 810, 66 S.Ct. at 1139. *See also Kiefer-Stewart v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, *rehearing denied*, 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1951); *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The standard of proof for a conspiracy requires then something more than parallel behavior. Moreover, it is not enough to prove that the alleged co-conspirators merely exchanged information. *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). *See also Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925) (exchange of information regarding credit-worthiness of customers does not violate the Sherman Act).

This court has had little opportunity to explore the parameters of the Supreme Court's decisions in this area. Two cases do discuss the issue in part. In *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 663 F.2d 253 (D.C.Cir.1981), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982), this court stated that an inference of a conspiracy may be drawn "when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self-interest, [and] that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action." *Id.* at 267. Likewise, in *Proctor v. State Farm Mutual Auto Insurance Co.*, 675 F.2d 308 (D.C.Cir.1982), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982), this court held that a conspiracy should only be inferred when the conduct in question is inconsistent with that to be expected from each party individually pursuing his own interest. *Id.* at 327.

■ Based on the foregoing, we can draw the following conclusions applicable to our analysis of this case. A plaintiff may establish a conspiracy under Section 1

of the Sherman Act by circumstantial evidence such as inferences drawn from the behavior of the alleged co-conspirators. Such an inference may only be drawn, however, when an alleged conspirator has acted contrary to his own independent interest.[12] Thus, parallel behavior *alone* is insufficient evidence from which to infer a conspiracy.[13] Once a plaintiff has brought forth sufficient circumstantial evidence from which a conspiracy may be inferred, the defendant may deny the existence of a conspiracy and offer an innocent explanation of the questioned conduct. If this explanation is plausible and more logical than a theory of concerted action, then a conspiracy may not be found.[14] At all times, of course, the ultimate burden of persuading the factfinder that a conspiracy exists is on the plaintiff.

■ Turning to the evidence presented by appellant in this case, the conclusion is inescapable that no conspiracy existed between the AAP and the ADA to deny Dr. Kreuzer active membership. The evidence presented by appellant shows regular ongoing communications of a general nature between the ADA and the AAP over a substantial period of time prior to Dr. Kreuzer's application. The mere showing of frequent relations between alleged co-conspirators, however, is insufficient to infer an illegal agreement. *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *Miller v. New York Produce Exchange*, 550 F.2d 762, 767 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). Therefore, this court will not infer a conspiracy to violate the antitrust laws based on a showing of regular contact between two independent professional associations on general matters of mutual interest and concern. This is the very purpose and nature of professional associations and this court will erect no barriers to accomplishment of this absent much more substantial evidence of a conspiracy to restrain trade than that adduced here. Adam Smith noted long ago that: "People of the same trade seldom

12. This formulation has been refined to require the congruence of two specific sets of circumstances to meet this test. First, a showing of acts by the defendants in contradiction of their own economic interests is required. Second, satisfactory demonstration of a motivation to enter into a conspiracy is required. *See, e.g., Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Venzie Corp. v. United States Mineral Products Co., Inc.*, 521 F.2d 1309 (3d Cir. 1975). Other courts have required only the first of these two circumstances. *See, e.g., Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir.1978); *Modern Home Inst. Inc. v. Hartford Accident & Indem. Co.*, 513 F.2d 102 (2d Cir.1975). The law in this circuit is uncertain. In *Federal Prescription Service v. American Pharmaceutical Association*, this court only spoke specifically to the first of these two requirements, but cited with approval to the Third Circuit's formulation in *Bogosian*. 663 F.2d at 267 n. 18. In *Proctor v. State Farm Mutual Auto Insurance Co.*, the court again spoke only to the first requirement, but then incongruously cited to *Bogosian* and *Venzie* as well as *Admiral Theatre Corp.*, 675 F.2d at 327. We find the divergence of opinion in other circuits unwarranted and in order to clarify our own past confusion

on this point we adopt the view of the Third Circuit that a showing of a motive to restrain trade is required. The Supreme Court in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), seemed specifically to answer this question. There the Court found the plaintiff's conspiracy theory inadequate where the interests of the alleged conspirators were divergent. In the absence of any common motivation, the Court concluded it was not possible to infer a conspiracy to restrain trade. 391 U.S. at 287, 88 S.Ct. at 1591.

13. Chief Judge Seitz of the Third Circuit has best articulated this:

[P]roof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but ... such evidence, without more, is insufficient unless circumstances under which it occurred make the inference of rational independent choice less attractive than that of concerted action.

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

14. To a certain extent this determination is a construct of probability: an inference of a conspiracy to restrain trade must be more probable than the inference of independent action in order for the inference of conspiracy to be drawn.

meet together, even for merriment and diversion, but the conversation ends in conspiracy against the public, or in some contrivance to raise prices." No matter how true this may have been in the eighteenth century, after nearly a century of American business operating under the Sherman Act we can no longer subscribe to such a near-sighted view of the business world let alone the learned professions. A plaintiff who brings suit under Section 1 of the Sherman Act still has the burden to prove a conspiracy. This burden will not be met merely by allegations of general contacts. *First National Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Likewise the inquiry by Ms. Holmquist and the letter from Dr. Sugarman are insufficient to establish a conspiracy. The only evidence of Ms. Holmquist's inquiry is her *post hoc* oral report to the Executive Council of the AAP on April 30, 1976. Appellant selectively quoted from the transcript of that meeting in such a manner as to lead one to believe that Ms. Holmquist had specifically asked the ADA about Dr. Kreuzer's membership application.[15] Thus, she appears to report: "In pursuing what we ought to do about Dr. Kreuzer ... I put the question very squarely to Elliott Dunn...." R.E. 322. Later in that session, however, Ms. Holmquist explains the ADA's response to her inquiry and cautions. "Bear in mind that the specific case I brought to him [Elliott Dunn] was one of a man who was not educationally qualified in prosthodontics, so they were not considering a dual specialty." Exhibit H to Plaintiff's Brief, R.E. 323. Because Dr. Kreuzer is educationally qualified in prosthodontics and because the AAP was aware of this, Ms. Holmquist obviously could not have asked the ADA specifically about Dr. Kreuzer. On the other hand, the exchange of letters between Dr. Sugarman and Dr.

Conway does contain a single reference to Dr. Kreuzer by name in the appended list of 20. It appears, however, in the body of neither letter. Nor does it appear in the background paper supplied by Dr. Sugarman. Dr. Kreuzer's name appears as only one among twenty appended to the background paper and without any special significance accorded it.

These specific contacts between the AAP and the ADA are of too *abstract* a nature for this court to infer a conspiracy to violate the Sherman Act. The AAP's inquiries regarding the limited practice requirement directed to the ADA appear to us to have been posed as a hypothetical question. It is probable that they were also regarded by the ADA as hypothetical. Indeed, the abstract nature of the ADA's response confirms this surmise.[16] Thus, after substantial discovery, appellant's argument that the ADA and the AAP conspired to violate the antitrust laws consists only of these two thin strands of evidence, each of which is so frayed that, even together, they cannot support the conclusion appellant urges.

In juxtaposition to this, the ADA has presented us with a persuasive explanation refuting the allegation of a conspiracy. The ADA has come forward to deny engaging in any conspiracy with the AAP. Moreover, the ADA has provided a reasonable alternative explanation for the tenuous evidence appellant relies on to support his allegation. The AAP incorporated the ADA's Principles of Ethics as its own. Accordingly, the AAP takes into consideration ADA interpretations of the Principles of Ethics including the ADA definition of periodontics and application of the limited practice requirement. This is, however, only one factor—albeit no doubt a persuasive one—that the AAP considers in its own independent decision making process for resolution of matters of professional ethics.[17] This, of course, necessitates a

---

15. See *supra* p. 1484 for text of language referred to here.

16. The ADA failed to respond to the second of Dr. Sugarman's inquiries because it involved a

more specific factual issue. Swanson Dep. Ex. 11, R.E. 286.

17. In this sense, the AAP's process for resolution of new ethical problems can be analogized to this court's resolution of a new legal issue.

certain amount of contact between the two organizations whenever the Periodontists encounter specific ethical problems. When the AAP was presented with the problem of how to treat periodontal prosthesis (in the guise of Dr. Kreuzer's application) it was only logical that it would turn to the ADA for advice because the issue was a general one that the Periodontists had every reason to suspect the ADA had previously considered with the other specialists within their profession. And when the ADA received such an inquiry it was only logical that the ADA would respond to it because, as the only national dental association, it has a vested interest in assisting dental speciality associations such as the Periodontists. Thus, each association's behavior was consistent with the behavior to be expected of actors independently pursuing their own interests.[18] Therefore, we conclude that Dr. Kreuzer has not met his burden to establish the existence of a conspiracy to restrain trade. Accordingly, we affirm the District Court's grant of summary judgment to the ADA.

## B. Per Se Illegality

Dr. Kreuzer also has asserted that within the AAP, individuals conspired to restrain trade in violation of Section 1 of the Sherman Act. Because the evidence amply indicates that various officers and members of the AAP acted in concert to enforce the limited practice requirement, we need not dwell long in our consideration of the threshold inquiry. There can be no doubt that a conspiracy existed within the AAP to deny Dr. Kreuzer's application for active membership. *See American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Therefore, our analysis proceeds to a determination of whether the limited practice requirement is an unreasonable restraint of trade, i.e., whether the conspiracy was unlawful.

■ Under the Supreme Court's judicial gloss on the statutory language of Section 1, the factfinder must weigh all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on trade. The inquiry mandated by this "rule of reason" can entail a lengthy and laborious process. For purposes of judicial economy, as the courts gained experience in the area of antitrust it became possible to identify certain types of recurring agreements which proved to be so consistently unreasonable that they could be branded illegal *per se* and the rule of reason inquiry dispensed with. Such conduct subject to *per se* treatment is presumed to be unreasonable, without any inquiry into the impact of the conduct, or the business excuse for its use. *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *Per se* rules of illegality, however, are appropriate only when conduct is manifestly anticompetitive. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–2558, 53 L.Ed.2d 568 (1977). To be considered manifestly anticompetitive, a practice must have a "pernicious effect on competition and lack any redeeming virtue...." *Northern Pac. Ry. Co. v. United States*, 356 U.S. at 5, 78 S.Ct. at 518.

When this court first considers a particular legal issue it will look to discover whether another circuit court has already resolved the issue. Prior resolution of an issue by another court will be taken into account. Such prior resolution of an issue by another circuit, however, is not binding on this circuit. It is, though, persuasive authority which should not be completely ignored. So too, the ADA's resolution of particular ethical problems are not binding on the AAP. There is no explicit agreement between the ADA and the AAP that the AAP will follow the ADA's lead in matters of professional ethics. Moreover, the ADA has no authority over the AAP, therefore it cannot enforce its own decisions related to ethical matters on the AAP. Indeed, the ADA really has no interest in whether the AAP adopts its ethics decisions.

**18.** In addition, we note the District Court's finding of a lack of anticompetitive motive on the part of the AAP. 558 F.Supp. at 686. This indicates that the actions taken were intended to benefit the public through improved periodontal service. Although such a consideration is not dispositive, it does add weight to our conclusions.

Appellant argues that the limited practice requirement constitutes a group boycott. Appellant draws our attention to the Supreme Court's recent decision in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), which, it is asserted, requires application of a *per se* rule to conduct of professionals which would be illegal *per se* for nonprofessionals, unless the conduct at issue is premised on ethical norms which would enhance the quality of the professional service. Appellant concludes that because there was no proof that the limited practice requirement was premised on ethical considerations and because group boycotts are treated as *per se* illegal for nonprofessionals the District Court erred in not finding the limited practice requirement *per se* illegal. Brief of Appellant 49–54.

■■■ The Sherman Act is, of course, applicable to members of the learned professions and their associations. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 348–49, 102 S.Ct. 2466, 2475–76, 73 L.Ed.2d 48 (1982); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Appellant relies in particular on the Supreme Court's quotation with approval in *Maricopa* of this language from *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, *group boycotts*, and tying arrangements." 457 U.S. at 344 n. 15, 102 S.Ct. 2473 n. 15 (emphasis added). The Supreme Court has also specifically held certain group boycotts *per se* illegal. *See, e.g., Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (organization of dress manufacturers boycotted retailers who dealt in pirated copies of original designs); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (retailer

combined with appliance manufacturers to boycott competing retailer).

The Periodontists argue that the District Court did not err in refusing to rule the limited practice requirement *per se* illegal. The AAP seems to contend that the District Court's finding that the limited practice requirement was noncommercial was the equivalent of finding that it was premised on public service. Brief of AAP 33–36. Therefore, under *Maricopa*, the limited practice requirement should be tested under the rule of reason because a professional organization is involved. The United States, in an *amicus curiae* brief, also forcefully argues that *per se* treatment is not the correct approach in this case. The United States asserts that a professional organization is the group best suited to judge the competence of its members to hold themselves out to the public as specialists. Brief of the United States 5–6. It is possible then that membership rules such as the limited practice requirement could serve to inform the public and serve a procompetitive function. *Id.* Thus, this procompetitive potential should be weighed against any alleged anticompetitive potential argues the United States. This weighing process is, of course, only possible under the rule of reason.

The proposition that group boycotts are *per se* illegal has some support in the decisional law and even a certain facial appeal. This court, however, has held that "[a *per se* rule] should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to drive out competitors but to achieve some other goal." *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1180 (D.C.Cir.1978) (Wilkey, J.) (MacKinnon, J., concurring with this holding, but otherwise dissenting). The Seventh Circuit has also recently held that boycotts are illegal *per se* only if used to enforce agreements that are themselves illegal *per se*. *United States Trotting Association v. Chicago Downs Association*, 665 F.2d 781 (7th Cir.1981) (*en banc*). The reasoning behind both decisions recognizes that the term "group boycott" can be applied to a wide variety of

divergent types of conduct. To outlaw all activity which might be labelled a group boycott is dangerous in that it might discourage certain reasonable concerted activity.[19]

■ In this case the attributes of *per se* illegality discernible in *Klor's* and *Fashion Originators' Guild* are not present. The AAP is a membership organization enforcing its membership rules. There is no clear showing of a purpose to exclude competitors. Numerous cases in the context of organized sports indicate that courts should be hesitant to fasten tags such as "group boycott" and *"per se"* in order to preclude inquiry into the business necessity occasioned by particular rules or practices. *See, e.g., Neeld v. National Hockey League,* 594 F.2d 1297, 1299 n. 4 (9th Cir. 1979); *Hatley v. American Quarter Horse Association,* 552 F.2d 646, 652 (5th Cir. 1977); *Deesen v. Professional Golfers' Association,* 358 F.2d 165 (9th Cir.), *cert. denied,* 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966); *Gunter Harz Sports, Inc. v. U.S. Tennis Association,* 511 F.Supp. 1103, 1115 (D.Neb.), *aff'd,* 665 F.2d 222 (8th Cir.1981). Because sanctioning or membership organizations do not actually compete with the individual member who is affected by a questioned practice, *per se* treatment is inadvisable. This is also true of professional organizations. When a conspiracy of this sort is alleged in the context of one of the learned professions, the nature and extent of its anticompetitive effect are often too uncertain to be amenable to *per se* treatment. *See Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir. 1983). Nor is this conclusion undercut by *Maricopa.* Under *Maricopa* an agreement to fix prices will not escape *per se* treatment simply because it is entered into by professionals and accompanied by unsupported ethical protestations. 457 U.S. at 348–49, 102 S.Ct. at 2475–76. In the context of an alleged group boycott, however, if a serious argument is made that the questioned practice amounts to a public service, sufficient questions of competitive

effect are raised to allow release from *per se* treatment. Therefore, we also affirm this aspect of the District Court decision.

## C. Rule of Reason Inquiry

The classic articulation of the rule of reason is set forth in the opinion of Justice Brandeis in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

In *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), the Supreme Court referring to this language stated that "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition."

■ The District Court found that the limited practice requirement passed muster under the rule of reason. The District Court decision, however, premised this solely on the fact that it found no anticompetitive *intent* in the Periodontist's adoption of a limited practice requirement. 558 F.Supp. at 686. The District Court seems to have felt that where a defendant to a

---

**19.** *See infra* p. 1493.

Section 1 claim presents a justification for a questioned practice the absence of anti-competitive intent is determinative.[20] *Id.* This is an erroneous application of the rule of reason and necessitates reversal of the District Court decision pertaining to this aspect of the case.

We cannot stress enough the language of the Supreme Court in *Chicago Board of Trade:* "This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." 246 U.S. at 238, 38 S.Ct. at 244. To understand why the intent of a defendant is not the determinative factor in conducting the rule of reason inquiry only requires a brief examination of the economic nature of group boycotts.

Group boycotts serve a variety of objectives. The classic group boycott is a concerted attempt by a group of competitors at one level of competition to insulate themselves from competition from nongroup members who seek to compete at that same level. *See generally*, L.A. Sullivan, *Antitrust* 230, 232, 244 (1977). Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter the level of competition at which the group operates. *Id.* In this particular case, Dr. Kreuzer alleges that the AAP and its active members have combined to deny him active membership and that such membership is a trade relationship necessary to compete at the same level as active members.

Not all group refusals to deal, however, can be so simply classified. Some are designed to serve economic efficiency or to advance the group's general economic self-interest without being intended to affect adversely any other group's profits. Alternatively, a concerted refusal to deal may be used to advance the group's social and moral objectives unrelated to the group's business and economic interests. Therefore, because group exclusionary tactics have different purposes and because some are not inconsistent with public policy, it is necessary to evaluate their economic *impact* beyond the asserted intent of the group engaged in the boycott. This is because the effects of a boycott are not necessarily dependent on the purpose of the boycott. Whatever the group's intent (and no matter how genuinely held), a boycott, if successful, may nonetheless injure the victim of the boycott and often thereby injure competition.[21]

The significance of the District Court's exclusive reliance on the AAP's lack of anticompetitive intent is easily lost in the court's silence on the potential anticompetitive effect of the limited practice requirement. Once the potential for anticompetitive impact that the limited practice requirement poses is set forth, the error of the District Court becomes clear. A first possible effect of the rule is to prevent periodontists who wish to keep the advantages of active membership in the AAP from competing with general dentists. An active member of the AAP may not engage in general dentistry under the limited practice requirement. A second possible effect is to prevent periodontists who do decide to compete with general dentists from fully competing with other periodontists who are active members. The evidence indicates that only active AAP members are referred

---

**20.** At oral argument, counsel for the Periodontists pointed to language in the District Court opinion that indicated an understanding of the correct application of the rule of reason. 558 F.Supp. at 685 ("Under the rule of reason, the inquiry this court must make is whether the challenged provision is one that promotes competition.") Notwithstanding this seeming awareness of the standard to be applied, when the District Court later actually applied the rule of reason it did so incorrectly. 558 F.Supp. at 686 ("In the case at bar, there is no evidence of anticompetitive intent...."). It is not sufficient that a court merely be aware of the correct rule of law. The court must then proceed to apply it and to apply it correctly.

**21.** Thus, the Seventh Circuit in a recent case strikingly similar to this stated that "it is effect or consequence which controls, not intent or motive." *Wilk v. American Medical Association,* 719 F.2d 207, 225 (7th Cir.1983).

to prospective patients thus eliminating non-AAP periodontists from this lucrative referral business. Finally, the consumer may be disadvantaged. in two ways. The consumer of periodontal services is allegedly never referred to periodontists who are not active members. This artificially limits the number of periodontists available to the consumer with a corresponding increase in the market price for periodontal services. Likewise, the consumer cannot go to a periodontist who is an active member of the AAP for his restorative dental needs. This results in additional cost and inconvenience to the patient with complicated dental needs who is deprived of the cost efficiencies which would otherwise be generated by one stop dental service.

On the other side of the balance, however, is the issue of service to the public—a dentist who devotes his *entire* working hours to practice as a periodontist, undoubtedly in the great majority of cases, will develop into a better and more skillful periodontist than a dentist who practices generally, or a dentist who has some basic skill as a periodontist but does not devote his entire practice to that specialty. In this instance, the AAP has asserted that its concerted refusal to deal with Dr. Kreuzer (in the form of the limited practice requirement) is premised not on an anticompetitive intent to exclude Dr. Kreuzer from the marketplace. Rather, the AAP asserts that this particular group boycott serves to advance a desirable social goal unrelated to the group's economic interests. Specifically, the AAP argues that the limited practice requirement allows the AAP to remain under the control of dentists who devote themselves exclusively to the practices of periodontics. This is the only way, the AAP contends, to insure that the AAP's mission to advance the art and science of periodontology and to educate the public about periodontal disease is not diluted. Brief of AAP 49–51. In short, the AAP argues that the limited practice requirement improves the quality of care of periodontal patients. Other courts have labelled such justifications for group boycotts the "patient care motive". *Wilk v. American Medical Association*, 719 F.2d 207, 226 (7th Cir.1983).

The leading case in this circuit demonstrating application of the rule of reason analysis to a professional association's justification of a group boycott under a patient care motive remains *American Medical Association v. United States*, 130 F.2d 233 (D.C.Cir.1942), *aff'd.*, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). In that case the Medical Society of the District of Columbia barred from use of area hospitals two former members expelled from the society for participation in a group prepaid medical practice. The society argued that the exclusion was a matter of ethical concern over patient care. This court held that even if that were true, because the conduct affected doctor income more than patient care it was illegal. In that instance, however, the court viewed little rational nexus between the professional rule and the asserted public protection. Where the rational nexus between the professional rule and public protection is much closer, courts are more willing to uphold self-regulation enforced by a group boycott. *See United States v. Oregon State Medical Society*, 343 U.S. 326, 336, 72 S.Ct. 690, 697, 96 L.Ed. 978 (1952). From this we can set the following standard for application of a rule of reason analysis to questioned conduct of professional associations justified under a patient care motive. When the economic self-interest of the boycotting group and its proffered justifications merge the rule of reason will seldom be satisfied. When, however, the justification for the boycott is closely related to a lawful purpose the rule of reason will generally be satisfied.

In the District Court, the Periodontists asserted that the limited practice requirement had a procompetitive effect and worked to increase the quality of patient care. The AAP now makes the same argument to this court. The District Court, however, made no such finding. Accordingly, we are constrained in making such a finding in the first instance. Moreover, even if evidence existed in the record to

support the asserted justification that the limited practice requirement improved the quality of patient care, it must be shown that the means chosen to achieve that end are the least restrictive available. *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *National Society of Professional Engineers v. United States*, 435 U.S. at 699–700, 98 S.Ct. at 1369–1370 (Blackmun, J., concurring). Here appellant has suggested a number of plausible less restrictive alternatives to the limited practice requirement such as a minimum number of hours per week devoted to the practice of periodontics. Impractical as such suggestion might appear at first blush, because the AAP has failed to demonstrate that the limited practice requirement is the least restrictive method available to achieve the asserted goal it is, at this stage of the proceeding,[22] an insufficient justification for a practice that in other respects has an anticompetitive potential—albeit minimal.

### D. Summary Judgment

 Rule 56(c) of the Federal Rules of Civil procedure provides that summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." In assessing such a motion all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Indeed, the record must reveal that the party opposing the motion would not be entitled to prevail under any discernible circumstances. Initially, the burden is on the movant to prove the absence of a genuine dispute as to any material fact. *McGehee v. Central Intelligence Agency*, 697 F.2d 1095, 1101–02 (D.C.Cir.1983). If proven, the party opposed must come forward with concrete evidence indicating the exist-

ence of a genuine issue of material fact. *Briggs v. Goodwin*, 698 F.2d 486, 489 n. 2 (D.C.Cir.1983). Although the Supreme Court has cautioned that summary judgment should be used sparingly in complex antitrust litigation, *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), these fundamental principles of civil procedure are equally applicable in antitrust litigation. *Proctor v. State Farm Automobile Insurance Co.*, 561 F.2d 262, 275 (D.C.Cir.1977), *vacated on other grounds*, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979) (significant evidence substantiating the theory of the complaint must be produced to defeat well supported motion for summary judgment); *Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263, 266–67 (D.D.C.1976), *aff'd*, 569 F.2d 666 (1977) (to defeat motion for summary judgment something more than naked assertions and broad generalities is required). This court, on review of a grant of summary judgment, will sustain the judgment only if a reasonable person could come to no factual conclusion other than that reached by the District Court. *National Association of Government Employees v. Campbell*, 593 F.2d 1023, 1027 (D.C.Cir.1978).

Dr. Kreuzer argues that because "[t]here is substantial evidence that AAP and ADA acted together in denying appellant active membership in AAP" the ADA is not entitled to summary judgment. Brief of Appellant 48. We find Dr. Kreuzer's misleading characterization of the evidence supporting a conspiracy as "substantial" to be entirely unjustified. As set out above, we find very little persuasive evidence of a conspiracy between the ADA and the AAP to restrain trade.[23] In *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1967), the

---

**22.** The AAP will, of course, have an opportunity on remand to establish the patient care motive and to prove that this is the least restrictive means available.

**23.** *See supra* pp. 1486–1487.

Supreme Court held that even in the context of complex antitrust litigation Fed.R. Civ.P. 56 bars a plaintiff from relying on bare allegations coupled with the hope that something could be developed at trial to support those allegations. The Court stated: "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." 391 U.S. at 290, 88 S.Ct. at 1593. Because we believe it was appropriate for the District Court to dismiss Dr. Kreuzer's action against the ADA we must reject his argument on appeal that the suit was not yet ripe for summary judgment.

Dr. Kreuzer also argues, however, that because evidence was adduced indicating that the effect of the limited practice requirement was anticompetitive and because there was no evidence of public health benefits which could not be achieved by less restrictive alternatives, trial was more appropriate than summary judgment in favor of the AAP. Brief of Appellant 48. As noted above, the District Court incorrectly applied the rule of reason in granting summary judgment to the Periodontists.[24] Therefore, it is unnecessary for us to reach this argument by appellant as the case against the AAP will be remanded for the District Court to apply the rule of reason anew.[25]

**24.** *See supra* pp. 1489–1490.

**25.** Our disposition of this case is such as to reverse the District Court on its grant of summary judgment to the AAP only on the ground that the court incorrectly applied the rule of reason. Accordingly, we remand the case for correct application of the rule of reason and do not express an opinion on Dr. Kreuzer's argument that this case is not yet ripe for summary judgment. On remand the District Court should take heed of *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Dr. Kreuzer has established at the trial

### III. Conclusion

▆▆ Finally, we wish to make clear in the strongest possible terms that the antitrust laws do not bar the formation of associations with membership limited to classes of similarly situated persons and dedicated to the joint pursuit of their common interests. It is only in that rare instance when such membership limitations have the effect of unreasonably restraining trade that the concerns of the antitrust laws are triggered. In this particular instance, one cannot help but feel that absent publication of the AAP Membership Directory as a referral guide, there would have been no concern of an antitrust violation. We hope, however, that the wrong lesson will not be drawn from this decision. This decision should not be viewed as raising any new barriers to the formation or operation of professional associations. Rather, this decision should only serve to caution such organizations to be aware that a practice intended to benefit the public may have a collateral adverse effect on competition. If it does, then such a practice must be the least restrictive means of achieving the desired goal and the public benefit rendered must outweigh the adverse effect on competition. Otherwise, this court reiterates its strong support for professional associations dedicated to furthering the public good, such as the AAP.

Affirmed in part, reversed in part and remanded for action consistent with this opinion.

level a case indicating that the limited practice requirement has some potential for anticompetitive effect. Although the Periodontists alleged procompetitive benefits were derived by the public from the rule, it never established evidence in the record of these benefits beyond the mere assertion of their existence. Moreover, the AAP never attempted to show that the limited practice requirement is the least restrictive means available for achieving the asserted public health benefits. Therefore, a District Court should well be cautious in granting summary judgment on this record.