**Re Alan ROSEFIELDE, et al.**

v.

**FALCON JET CORPORATION.**

**GULFSTREAM III ASSOCIATES, INC.**

v.

**FALCON JET CORPORATION.**

**Civ. A. Nos. 82–3788, 85–4671.**

United States District Court,
D. New Jersey.

Jan. 11, 1988.

Edwin R. Alley, Carpenter, Bennett & Morrissey, Newark, N.J., Stephen M. Hudspeth, Darrell E. Prescott, Coudert Brothers, New York City, Harold C. Kohn and Joanne Zack, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for plaintiffs.

Allyn Z. Lite, Goldstein, Till & Lite, Newark, N.J., John J. Reilly and Gary D. Sesser, Haight, Gardner, Poor & Havens, New York City, for defendants.

## OPINION AND ORDER

LECHNER, District Judge.

This case is a consolidation of the two above-mentioned cases (the *"Rosefielde"* and *"Gulfstream"* cases). The *Rosefielde* case was filed in the District of New Jersey in November, 1982. It involves a protracted dispute concerning the imposition of a warranty transfer fee by defendant Falcon Jet Corporation ("Falcon Jet") upon plaintiff Alan Rosefielde. In October, 1983 the *Rosefielde* complaint was amended to add two antitrust claims. Count sixteen of the *Rosefielde* Amended Complaint charges Falcon Jet and seven other business jet manufacturers conspired to fix the base price of new business jets in the United States. Count seventeen of the *Rosefielde* Amended Complaint alleges a conspiracy among Falcon Jet and three other business jet manufacturers to limit the contractual terms of sale of new business jets so as to inhibit their resale.

The *Gulfstream* case was originally filed in the Central District of California in June, 1985, but was consolidated with the *Rosefielde* case by Judge Barry in April, 1986. The *Gulfstream* case alleges a price-fixing conspiracy, the operative facts of which are identical to those of count sixteen of the *Rosefielde* Amended Complaint. The *Gulfstream* case and count sixteen of the *Rosefielde* Amended Complaint will be referred to collectively as the "price-fixing claims."

The court is now faced with cross-motions for summary judgment with respect to the price fixing claims, and defendants' motion for summary judgment on count seventeen of the *Rosefielde* Amended Complaint ("count seventeen").[1] Defendants' motion on the price fixing claims is granted with respect to the existence of an express agreement to fix prices, and is denied in all other respects. Plaintiffs' cross-motion for summary judgment on the price-fixing claims is partially granted and partially denied. Finally, defendants' motion for summary judgment on count seventeen is granted.

*Background*

Plaintiff Alan Rosefielde is a former practicing tax attorney who is presently

---

**1.** Motions are also pending to exclude certain testimony of plaintiffs' expert witnesses and to bar use of certain government reports. Because these motions have not been argued and because these motions concern rulings which may be more appropriately addressed immediately prior to or during trial, these motions will be addressed by Judge Wolin, the judge to whom this case has been re-assigned. For the purpose of this opinion, all evidence submitted by both parties is assured to be admissible.

engaged in the business of purchasing, selling and leasing business jet aircraft. (Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross–Motion for Summary Judgment, dated September 30, 1986 ("Plaintiffs' Mem.") at page "a", Table I.)[2] Mr. Rosefielde organized each of the other plaintiffs, which are closely held corporations or limited partnerships, for the purpose of purchasing Falcon Jet or Gulfstream[3] business jets. (Memorandum in Support of Defendants' Motion for Partial Summary Judgment with Respect to the Sixteenth and Seventeenth Counts of the *Rosefielde* Amended Complaint and for Summary Judgment in *Gulfstream III Associates,* dated August 1, 1986, ("Defendants' Mem.") at 7.) Mr. Rosefielde conducts all of the business affairs of each of the plaintiffs. (Plaintiffs' Mem. at page "a", Table I.) Typically, Mr. Rosefielde, through one of his corporations,[4] purchases new business jets in the United States and then assigns the contract to a subsequent purchaser. (Defendants' Mem. at 9.) During the period between the purchase of the aircraft by the plaintiffs and the assignment to a subsequent purchaser, the planes are managed by Jet Leasing Corporation, of which William F. Handy, a close associate of Mr. Rosefielde, is the president and principal shareholder. (Defendants' Mem. at 8.)

Defendant Falcon Jet Corporation is the United States subsidiary of defendant Avions Marcel Dassault–Breguet Aviation ("AMD–BA"), a French aircraft manufacturer. AMD–BA manufactures military and civilian aircraft, including the "Falcon" series of business jet aircraft. (Defendants' Mem. at 6–7.) Falcon Jet is responsible for marketing and selling Falcon business jets in the western hemisphere. (Defendants' Mem. at 6.) In most instances Falcon Jet purchases "green" aircraft (*i.e.,* aircraft sold without exterior paint, completed interiors, or permanent avionics packages) from AMD–BA and ships them to the United States for completion according to the specifications of Falcon Jet customers. (Defendants' Mem. at 7.)

The Falcon Jet aircraft which plaintiffs purchased from defendants were "completed" aircraft sold with a standard equipment package for a "base" price. (Defendants' Mem. at 15.) The base price is the price of an aircraft equipped to a standard specification set by the manufacturer before the addition of optional equipment or price escalation.[5] (Plaintiffs' Mem. at 13 n. 25.)

The *Rosefielde* plaintiffs contracted to purchase eight Falcon jets over a period of two years beginning in 1978. (Defendants' Mem. at 19.) Six of these contracts were assigned to subsequent purchasers who accepted legal title to the aircraft prior to the time of delivery. (*Id.*) Three of those assignees are not parties in this action. (Defendant's Mem. at 10.) In 1981, the *Gulfstream* plaintiffs contracted to purchase two Gulfstream Aerospace Jets. One of these contracts was cancelled and the other was assigned to a non-plaintiff. (Defendants' Mem. at 11.) In addition, plaintiffs terminated three options to purchase Gulfstream IV aircraft. (Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment with Respect to the Sixteenth and Seventeenth Counts of the *Rosefielde* Amended Complaint and for Summary Judgment in *Gulfstream III Associates;* Memorandum in Opposition to Plaintiffs' Cross–Motion for Summary

---

**2.** Because of the mass of supporting material accompanying the parties' motions, citations in most instances are to the appropriate briefs, which in turn cite to the supporting data.

**3.** Gulfstream business jets are manufactured by the Gulfstream Aerospace Corporation, an American aircraft manufacturer. (Plaintiffs' Mem. at 1, n. 1.) Gulfstream Aerospace and defendant Falcon Jet Corporation are two of the alleged co-conspirators which exchanged price information with the other business jet manufacturers.

**4.** Mr. Rosefielde has not purchased or sold any aircraft personally. (Defendants' Mem. at 8.)

**5.** Falcon Jet did not subject the Rosefielde contracts to price escalation. (Defendants' Mem. at 15.)

Judgment, dated November 12, 1986 ("Defendants' Reply") at 55.)

In July, 1982, a dispute arose between Mr. Rosefielde and Falcon Jet concerning the imposition of a $100,000 assignment fee to transfer the warranty of a Falcon Jet aircraft from Mr. Rosefielde to another customer. (DX–454; Defendant's Mem. at 11.) In November, 1982, the *Rosefielde* plaintiffs filed a fifteen count complaint in the District of New Jersey.[6] The first six counts of the complaint, alleging that the defendants attempted to monopolize the business jet market, were dismissed with prejudice in June of 1985. (Defendants' Mem. at 13.) The remaining nine counts are contract and tort claims based on defendants' warranty transfer policy. (Defendants' Mem. at 11.)

In October, 1983, plaintiffs amended their complaint to add two additional counts alleging conspiracies in violation of Section One of the Sherman Act, 15 U.S.C. § 1. Count sixteen alleges a horizontal price-fixing conspiracy among defendants and seven international business jet manufacturers.[7] (Defendants' Mem. at 11.) Count seventeen alleges a conspiracy among the same manufacturers to fix the contractual terms of sale for the purpose of inhibiting the resale of new business jets. (Defendants Mem. at 11.)

Defendants have filed several previous motions for summary judgment. The first motion, directed at counts one through six, the monopolization counts of plaintiff's original Complaint, was not adjudicated because plaintiffs dropped these counts shortly before their response was due, and agreed to a dismissal with prejudice. (*See* Defendants' Mem. at 12; Plaintiffs' Mem. at 20, n. 52.) Defendants then filed a motion for partial summary judgment as to plaintiffs' contract and tort claims in June of 1985. (Defendants' Mem. at 13.) Finally, in August, 1985, defendants filed a mo-

tion for partial summary judgment with respect to the sixteenth and seventeenth counts of plaintiffs' Amended Complaint. Defendants also filed motions *in limine* to exclude certain testimony of plaintiffs' expert witnesses.

Ruling on defendants' motions, Judge Lacey denied in part and granted in part summary judgment on the contract and tort claims. He also ruled that plaintiffs' expert witnesses would be precluded from testifying unless they filed supplemental reports and submitted to further depositions. He then denied defendants' motion for summary judgment as to counts sixteen and seventeen without prejudice to renewal after plaintiffs' experts submitted to the supplemental discovery orders.[8] After plaintiffs' experts complied with Judge Lacey's orders, defendants renewed their summary judgment motion with respect to the price fixing claims and count seventeen of the *Rosefielde* case. (Defendants' Mem. at 13.) Plaintiffs then filed a cross-motion for summary judgment with respect to liability on the price fixing claims, seeking to leave for trial only the matter of plaintiffs' damages. (Plaintiffs' Mem. at 103.)

*Facts*

1. The Price Fixing Claims

Since the early 1970's eight business jet manufacturers which sell their product in the United States have engaged in a regular exchange of price and other information on a reciprocal reciprocal basis. (Plaintiff's Mem. at 13, pages "a" and "b", Table II.) This exchange took place primarily during monthly telephone conversations between the sales engineers of the various manufacturers. (Plaintiffs' Mem. at 15; Defendant's Mem. at 18.) The sales engineers exchanged information relating to the "base" price of the aircraft for the next available delivery. (Plaintiff's Mem. at 13; Defendants' Mem. at 18.) This information

---

**6.** The *Gulfstream* case was filed in the Central District of California in June, 1985. (Defendants' Mem. at 12.)

**7.** The operative facts of count sixteen are identical to the price-fixing conspiracy alleged in the *Gulfstream* case. (Defendants' Mem. at 12.)

**8.** Judge Lacey subsequently retired from the bench. The *Rosefielde* case was then transferred to Judge Barry, who consolidated *Rosefielde* and *Gulfstream* in April, 1986 in this district.

was recorded in internal Falcon Jet documents called "price list comparisons." (*e.g.*, PX–147, Defendants' Mem. at 18.) These documents listed the base price, the next available delivery, production rate, price of typical options, and escalated and equipped prices of Falcon Jet and other aircraft. (Defendants' Mem. at 18.)

The price list comparisons were widely circulated among sales representatives as well as executives of Falcon Jet. (Defendants' Mem. at 19; Plaintiff's Mem. at 5, 46.) Plaintiffs allege Falcon Jet executives used this information to set the prices of their aircraft. (Plaintiffs' Mem. at 5, 26, page "c", Table III.) Defendants claim, to the contrary, the information exchange was not authorized by executives of Falcon Jet, but the practice merely evolved over time among sales engineers, who had or have no pricing authority. (Defendants' Mem. at 18.) It is contended this information exchange was meant to assist the sales engineers in their efforts to sell Falcon aircraft —not to set prices.

Since 1980 Falcon Jet was responsible for publishing the Business Jet Activity Report ("BJAR") which reported detailed order and delivery information including the names of individual purchasers.[9] (Plaintiffs' Mem. at 16.[10]) The BJAR was distributed monthly to all of the aircraft manufacturers who contributed information to it. (Plaintiffs' Mem. at 17–18.) Plaintiffs also claim representatives of the various aircraft manufacturers exchanged information following the annual convention of the National Business Aircraft Association. (Plaintiffs' Mem. at 16.)

Defendants concede there "is no question that sales engineers for aircraft companies routinely exchanged information relating to the published list price and performance characteristics of aircraft." (Defendants' Mem. at 18.) However, the defendants dis-

agree with the inferences plaintiffs draw from these facts.

In opposition to the plaintiffs' allegation of conspiracy, defendants have offered sworn statements of the senior executives of all the business jet manufacturers denying the existence of any agreement or understanding among them with respect to price fixing. (Defendants' Mem. at 30.) In addition, plaintiffs' economic expert, Richard Barber, has consistently stated he is unaware of any evidence which suggests the alleged co-conspirators set prices pursuant to an express agreement to fix or adhere to the prices exchanged. (Barber Tr. 501–502, 8/14/87 Tr. 69–70, 84–85.)

Defendants argue to infer the existence of any agreement, whether express or tacit, is implausible because there was a high level of competition among business jet manufacturers throughout the relevant period of the lawsuit.[11] For example, the defendants have produced scores of advertisements relating to the price competitiveness of various aircraft. (Defendants' Reply at 47–48.) Additionally, two government reports have stated that the general aviation industry is highly competitive. (Defendants' Mem. at 4, 17, 28–29; *cf.* Plaintiffs' Mem. at 12 n. 22, 17 n. 42.) Intense rivalry is especially apparent between domestic and foreign business jet manufacturers. Defendants have introduced a mailing campaign initiated by American business jet manufacturers in an attempt to discredit and draw business away from foreign manufacturers including Falcon Jet. (Defendants' Mem. at 28 (citing DX–1600).) Defendants also have shown the market shares of the alleged co-conspirators fluctuated widely during the period in which the alleged conspiracy existed. (Defendants' Mem. at 31; Report of Defendants' Economic Expert, M.A.

---

**9.** Prior to 1980 the BJAR was published by Rockwell International. In that year, Rockwell ceased selling business jets, so the compilation and distribution of the BJAR was taken over by Falcon Jet.

**10.** *See also,* Report of Plaintiffs' Economic Expert Richard J. Barber, dated June 28, 1985 ("Barber Report") at 31–34.)

**11.** The relevant period of this lawsuit is roughly 1978 through 1982, the years during which defendants and other business jet manufacturers allegedly agreed to fix prices. (10/19/87 Tr. at 101.)

Adelman ("Adelman Report") at Figure 1, Table 1, Figure 6, Table 6.)

Plaintiffs have argued that the information exchange was a *per se* violation of the antitrust laws because, as they claim, the exchange of price information had the anticompetitive effect of raising or stablizing business jet prices. (Plaintiffs' Mem. at 57.) As evidence of this anticompetitive effect, the plaintiffs have introduced the reports of their expert witnesses Richard Barber and Seymor Laskow. The Barber Report examines the prices recorded in the price list comparisons and concludes that new business jet prices rose or remained stable from 1979 to 1983 while the demand for business jets dropped by over 80%. Plaintiffs claim this fact is highly probative of the existence of a conspiracy to fix prices within the business jet aircraft industry. (Plaintiffs' Mem. at 34, 77.) The Laskow Report supports Mr. Barber's conclusion by showing that the majority of sales by Falcon Jet during this period were at or above the Falcon Jet prices as reported in the price list comparisons. (Plaintiffs' Mem. at 61.)

The defendants object to both these reports. They claim that not only are the conclusions reached by Barber and Laskow fallacious, but the methods which they employed to reach these conclusions are deceptive. (*See, e.g.,* Defendants' Mem. at 17–25.) Defendants further offer the reports of their own economic experts, Morris Adelman and Bruce Stangle which show that discounts from list price occurred during periods of slackened demand, and prices in the industry actually dropped during the 1979 to 1983 period. (Defendants' Mem. at 18.)

The parties also debate a number of factual issues including whether the prices exchanged were actual prices charged to customers or merely list prices, whether the price information was publicly available, and whether the manufacturers exchanged "secret" pricing information. Both parties can support their factual assertions with cites to the voluminous record of documents and depositions which accompanies these motions, however the resolution of these issues is not material to the outcome of the parties' motions for summary judgment. Therefore, they are not considered at length in this opinion.

### 2. Count Seventeen

Plaintiffs' second antitrust claim alleges that four business jet manufacturers—Falcon Jet, British Aerospace, Gates Learjet Corporation and Cessna Aircraft Company —engaged in a conspiracy to deter the resale of new business jets by including in their contracts clauses which impede contract assignment and warranty transfers. This claim is based upon evidence that the four business jet manufacturers each had policies of deterring resales, that representatives of various aircraft manufacturers discussed the effect of business jet resales at "forecasting meetings," and that executives from Falcon Jet and British Aerospace contacted executives of other business jet manufacturers on two separate occasions to discuss their policies on deterring resales and the number of jets each manufacturer had up for resale. These facts will be considered in greater detail in the section of this memorandum granting defendants' motion for summary judgment on count seventeen.

### Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. Rule 56(c). Accordingly, to defeat a motion for summary judgment, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. Rule 56(e).

■ On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *See, Fragale & Sons Beverage Co. v. Dill,* 760

F.2d 469, 472 (3d Cir.1985). Moreover, "at the summary- judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 106 S.Ct. at 2511. This determination "must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 2514. Thus, a motion for summary judgment may be granted unless the evidence, construed in favor of the non-moving party, is sufficient for a reasonable jury to return a verdict for that party. *Id.*

■ Summary judgment is an appropriate means of disposing of complex cases where factual contentions lack support in the record. *See, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (antitrust action); *Anderson, supra* (libel action); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (wrongful death action). Granting summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 106 S.Ct. at 2553. Similarly, a summary judgment motion in an antitrust case should be granted if the plaintiff's allegations are unsupported or "if defendant has introduced probative evidence rebutting the antitrust allegations in the complaint, and plaintiff fails to come forward with factual support for his allegations." 10A Wright, Miller & Kane, *Federal Practice & Procedure,* § 2732.1, p. 328.

■ The Third Circuit has determined that the elements of a cause of action under section one of the Sherman Act [12] are: (1) that the defendants contracted, combined or conspired among each other [or with other co-conspirators]; (2) that the combination or conspiracy produced adverse, anti-competitive effects, within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser Dodge v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.,* 786 F.2d 564, 572 (3d Cir.1986). Thus, concerted action is an essential element of a Section One claim. *Link v. Mercedes Benz of North America, Inc.,* 788 F.2d 918, 922 (3d Cir.1986). Unilateral or independent action, irrespective of its intent, does not violate Section 1. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Hudson's Bay Co. v. American Legend Co-op.,* 651 F.Supp. 819, 838 (D.N.J.1986).

■ Because direct evidence of a conspiracy is often difficult to show, a conspiracy may be inferred from circumstantial evidence. However, the extent to which such inferences can be made is limited. *Matsushita,* 106 S.Ct. at 1360. For example, plaintiff has not provided evidence of the existence of a conspiracy if he has merely shown the existence of an opportunity to conspire, *Fragale & Sons,* 760 F.2d at 473, or consciously parallel business behavior, *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 208 (3d Cir.1980). In order for an antitrust plaintiff to carry his burden of proof upon a claim of concerted price fixing, he must provide evidence that "tends to exclude the possibility" of independent action on the parts of the alleged conspirators. *Matsushita,* 106 S.Ct. at 1357 (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471).

■ Once the plaintiff establishes a conspiracy can be inferred from circumstantial evidence, the defendants may deny the existence of the conspiracy and "offer an innocent explanation of the questioned con-

---

**12.** Section 1 of the Sherman Act states, in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal.

duct." *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1488 (D.C. Cir.1984). In some cases, sworn denials of the defendants may be sufficient to shift the burden of proof back to the plaintiff. *See, Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246, 1257 (S.D.N.Y.1986); *aff'd in part,* 822 F.2d 246 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 513 F.Supp. 1100, 1141 (E.D.Pa.1981), *rev'd in part,* 723 F.2d 238 (3d Cir.1983), *rev'd,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Therefore, even if the plaintiffs present circumstantial evidence from which a conspiracy can be inferred, such evidence without more "is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action." *Bogosian v. Gulf Oil,* 561 F.2d 434, 446 (3d Cir.), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *accord Matsushita,* 106 S.Ct. at 1357. Moreover, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita,* 106 S.Ct. at 1356.

Therefore, in order for plaintiffs to survive defendants' motion for partial summary judgment with respect to the price fixing claims and count seventeen of the instant complaints, plaintiffs must proffer evidence (to be construed in their favor) such that a reasonable jury might find that the inferences of conspiracy are stronger than the possibility of independent action by the defendants. This burden of proof may be heightened if the allegations of

conspiracy make "no economic sense." *Matsushita,* 106 S.Ct. at 1356. Summary judgment will be entered against a plaintiff if he cannot show "the inference of conspiracy is reasonable in light of the competing inferences of independent action or colusive action that could not have harmed [plaintiff]." *Matsushita,* 106 S.Ct. at 1357.

*Discussion*

I. The Price Fixing Claims

The most probative evidence of a conspiracy to fix prices within the business jet industry is the reciprocal exchange of price information among the sales engineers of the various manufacturers, as evidenced by the Falcon Jet price list comparisons. (*e.g.,* PX–147, PX–149), and reams of deposition testimony (*see,* Plaintiffs' Mem. at page "a", Table II).[13]

Plaintiffs cite *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) which states that the reciprocal exchange of price information among competitors "is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of [section one] of the Sherman Act." *Id.* at 335, 89 S.Ct. at 511. (Plaintiffs' Mem. at 46.) Plaintiffs will be granted partial summary judgment with respect to this element of their claim. However, this fact alone does not entitle plaintiffs to complete summary judgment on the price fixing claims. As the *Container* case itself states, "'[p]rice information exchanged in some markets may have no effect on truly competitive price." *Id.* at 337, 89 S.Ct. at 512.[14] Thus, the mere showing of an exchange of price information among competitors, without more, is insufficient to establish a violation of the antitrust laws. Plaintiffs must also

---

**13.** Plaintiffs admit there is no direct evidence of an express agreement to fix prices in the industry (*see* 10/18/87 Tr. at 97); therefore, defendants are granted summary judgment with respect to the existence of an express agreement to fix prices. However, plaintiffs argue the information exchange itself facilitated a tacit agreement to adhere to the prices exchanged. (*Id.* at 100.)

**14.** In markets which are oligopolistic, where the competition is for a fungible product, and demand is inelastic, the exchange of price information has the anticompetitive effect of stabilizing prices. *See Container,* 393 U.S. at 337, 89 S.Ct. at 512; *Gypsum,* 438 U.S. at 426, 457, 98 S.Ct. at 2868, 2883. But, where the exchange of information takes place in a market which is competitive, where the product is not fungible, competition is based on quality rather than price, and the market is elastic, then no anticompetitive effect exists. *See,* Von Kalinowski, 16A *Business Organizations,* § 6A.02[2] n. 58.

show that the information exchange had an anticompetitive effect on prices. *Id.* at 339, 89 S.Ct. at 513 (Fortas, J. concurring); *United States v. United States Gypsum,* 438 U.S. 422, 436 n. 13, 449 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978).

This results from the rule that "conduct as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 106 S.Ct. at 1357 (citing *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471). A plaintiff "should present direct or circumstantial evidence that reasonably tends to prove that the [defendants'] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). In other words, the plaintiffs may alternatively show the defendants had an anticompetitive intent in entering into the agreement. *Gypsum,* 438 U.S. at 436 n. 13, 98 S.Ct. at 2873 n. 13. To support an inference of more than a mere exchange of information, that is a conspiracy in violation of section one of the Sherman Act, the plaintiffs must show "the inference of rational, independent choice [is] less attractive than that of concerted action." *Bogosian,* 561 F.2d at 446; *accord Matsushita,* 106 S.Ct. at 1357.

Before considering whether the plaintiffs have offered sufficient probative evidence that the agreement to exchange price information had an anticompetitive motive or effect, it is necessary to address the defendants' contention that the inference of conspiracy should not be drawn in this case because the factual context of the plaintiffs' claim renders such an inference implausible.

### A. *The Existence of a Conspiracy to Fix Prices*

■ As mentioned, the extent to which an inference of a conspiracy can be drawn from circumstantial evidence is limited. One of these limits is the plausibility of the conspiracy claim. As the Supreme Court reemphasized in *Matsushita,* the jury

should not be permitted "to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Matsushita,* 106 S.Ct. at 1360 (citing *Monsanto,* 465 U.S. at 762–764, 104 S.Ct. at 1470–1471). A court must consider the "practical obstacles" to the implementation of the alleged conspiracy in connection with defendants' motion for summary judgment. *Matsushita,* 106 S.Ct. at 1357.

Implausibility is established if the plaintiffs' claim "simply makes no economic sense." *Id.* at 1356. Although this standard is vague, *Matsushita* is instructive. In that case, American manufacturers of electronic products alleged a two-fold horizontal conspiracy among Japanese electronics manufacturers to drive the American competitors out of business. The first facet of the alleged conspiracy was an agreement among the Japanese manufacturers to charge artificially high prices for their products in Japan. The second step involved using those profits to support artificially low predatory pricing of Japanese electronics products in the United States.

The *Matsushita* Court held that the Japanese defendants "had no motive to enter into the alleged conspiracy" and affirmed the District Court's order of summary judgment for the defendants. 106 S.Ct. at 1360. The Supreme Court based this conclusion in part on the fact that predatory pricing schemes are inherently risky because all the firms must agree together to forego short term profits for the sake of a long term uncertainty. *Id.* at 1357. Because this scheme had allegedly existed for over twenty years without reaching its intended goal of driving American manufacturers out of business, the *Matsushita* Court found the existence of such a conspiracy was implausible and required the plaintiffs to show "more persuasive evidence to support their claim than would otherwise be necessary" to infer a conspiracy. *Id.* at 1356.

Unlike *Matsushita,* the conspiracy alleged in this case involves raising prices rather than lowering them. This means the conspiracy alleged by plaintiffs is inher-

ently more plausible in terms of a motive for the defendants to enter into the agreement. Moreover, although the information exchange has existed for at least fifteen years,[15] the plaintiffs allege the price-fixing agreement existed only for a four year period.[16]

Notwithstanding these distinctions, defendants argue the conspiracy alleged by plaintiffs is implausible because of competition within the industry. For example, defendants cite two reports prepared by government agencies which define the general aviation industry as highly competitive. International Trade Commission, *Competitive Assessment of the U.S. Commuter and Business Aircraft Industries*, 1817 USITC Publication 5 (March 1986) ("ITC Report")[17]; Department of Commerce, *A Competitive Assessment of the U.S. General Aviation Aircraft Industry*, xviii (June 1986) ("DOC Report"). These reports attribute the declining competitiveness of domestic aircraft producers in the business jet industry and market since the early 1980's in part to "strong competition from foreign manufacturers." ITC Report at ix; *accord* DOC Report at 34.

Rivalry between American and foreign business jet manufacturers, as separate groups, is also evident in the formation of the American Business Aircraft Committee ("ABAC") which was organized as a response to the pressures of foreign competition on the U.S. market. ITC Report at 108. Gulfstream Aerospace and Cessna Aircraft, both manufacturers of business jets and alleged co-conspirators along with defendants, were members of the ABAC. (DX–1600.) One of the tasks of the ABAC was to develop a large mailing campaign to encourage U.S. companies to buy American manufactured business aircraft. (Defendants' Mem. at 27–28.) A brochure mailed out by the ABAC specifically targeted Falcon Jet as one of the foreign business jet manufacturers which the members of the ABAC were trying to discredit. (DX–1600.) Defendants claim it is implausible that two of the alleged members of the conspiracy, Gulfstream Aerospace and Cessna Aircraft, would engage in a campaign designed to draw business away from another member of the conspiracy and expect the conspiracy to continue. This is especially so during the period of suppressed demand, 1980–82.[18]

Other evidence of competition in the business aircraft industry is the price competitive advertising of all the manufacturers throughout the relevant time period (Defendants' Reply at 47–48), as well as the fluctuating market shares of the alleged co-conspirators.[19] (Defendants' Mem. at 31; Adelman Report, Table 1, Table 6.) The fluctuating market shares of the business jet manufacturers suggest a signifi-

---

**15.** *See,* Plaintiffs' Mem. at 13 ("Since at least the early 1970's, defendants and the other seven manufacturers of business jets sold in the United States exchanged among themselves on a regular *quid pro quo* basis large amounts of information on their current and future prices.")

**16.** *See* 10/19/87 Tr. at 101.

**17.** Both plaintiffs and defendants cite to the ITC Report. (Defendants' Mem. at 3, 16, 28; Plaintiffs' Reply to Defendants' Memorandum of 11/12/86, dated 12/10/86 ("Plaintiffs' Reply") at 15.)

**18.** The one point on which plaintiffs' and defendants' experts agree is that demand for business jets rose steadily from 1976, peaked in 1979, and then declined steadily to a low in 1982. Plaintiffs' expert Barber reports that 346 aircraft were ordered by customers in 1979, while in 1982 that number dropped to 65 or-

ders. (Barber Report at 20.) Defendants' expert Adelman measures demand by quarterly sales. In the first part of 1979, sales were approximately 130 contracts per quarter, while in the third quarter of 1982 sales hit a low of 15 planes. (Adler Report at 35.)

**19.** The Barber Report does not present an analysis of the relative market shares of the competing business jet manufacturers. Although Mr. Barber recognizes the possibility of such an analysis, he relies solely upon abstract calculations to determine market concentration. (Barber Report at 13–17.) The Barber Report does not address directly the fluctuation of market shares. (p. 24, n. 11.) For example, according to the Adelman Report, Falcon Jet's market share in the years 1977 through 1983 was 19.0%, 12.3%, 16.4%, 28.3% (industry leader), 13.2%, 13.3% and 17.2%, assuming the plaintiffs' market definition (Table I), or 3.8%, 4.1%, 3.6%, 7.5%, 8.5%, 17.3% (industry leader), and 8.0%, including sales of used business jets. (Table 6.)

cant level of competition among the manufacturers. Donald S. Clark, *Price–Fixing Without Collusion: An Antitrust Analysis of Facilitating Practices After Ethyl Corp.*, 1983 Wis.L.Rev. 887, 906; Richard A. Posner, *Antitrust Law,* 62 (1976). These data also suggest the maintenance of a conspiracy among the business jet manufacturers would be prohibitively difficult because the co-conspirators would have to devise a formula for equalizing the differences in market share among the co-conspirators.

In markets where the products are heterogeneous, or where there is rapid technological change, in order for a price-fixing cartel to function "it may be necessary to establish and enforce a complex schedule of prices corresponding to gradations in actual or perceived quality attributes among the competing products." United States Department of Justice, *1984 Merger Guidelines,* 2 Trade Reg.Rep. (CCH) ¶ 4493.401. There is no evidence in the record to support such a finding.

It therefore appears implausible that a conspiracy among business jet manufacturers could exist in an industry where there is direct evidence of a high level of competition among the manufacturers over price as well as the fluctuating market shares. To enter into such an agreement would not be economically feasible because the individual profits gained by artificially high prices would be offset by the competition over market share. There is no evidence present in the record to suggest that a conspiracy of the type which would be necessary to account for all of these factors could have existed.[20] Nonetheless, plaintiffs have offered substantial evidence of both an anticompetitive purpose and effect based on the information exchange. Giving the plaintiffs the benefit of all inferences which can be drawn, a genuine issue of material fact exists as to whether the information exchange facilitated a tacit agreement among business jet manufacturers to adhere to the exchanged prices. Therefore, defendants' motion is granted with respect to the question of an express agreement to adhere to the exchanged prices, but plaintiffs' and defendants' motions are denied in all other respects.

### B. *Anticompetitive Intent*

Evidence of an anticompetitive intent to enter into the agreement to exchange information in this case is offered through the testimony of plaintiffs' witness Mr. William Handy, a former Falcon Jet sales engineer and presently a close business associate of Mr. Rosefielde. Mr. Handy explained that by using the information obtained from the price list comparisons, Falcon Jet salesmen could "neutralize the competition" by eliminating the uncertainty as to what price and delivery date the competition was offering for a comparable model aircraft. (Handy Tr. 634–635; Plaintiff's Mem. at 76.) Plaintiffs have also introduced evidence that the senior executives of Falcon Jet and other business jet manufacturers were aware of the price information exchange and considered the data obtained by the sales engineers to set the price of business jets. (Plaintiffs' Mem. at 26–27, 76; *e.g.,* Rosanvallon Tr. 321–325, PX–1307, PX–896.)

Faced with this evidence, defendants have offered the sworn denials of the senior executives of all the aircraft manufacturers which are charged with participating in the conspiracy. (Defendants' Mem. at 30.) In addition, the defendants have offered an "innocent explanation of the questioned conduct." *Kreuzer,* 735 F.2d at 1488. Defendants cite the testimony of sales engineers from the various business jet manufacturers stating they only exchanged publicly available price information to compare their aircraft to those of their competitors and thereby assisted their salesmen to promote sales of their own aircraft. (Defendants' Mem. at 31.) Additionally, defendants note even plaintiffs' economic expert Richard Barber has stated

---

**20.** Because the opportunity to compete over factors other than price is present in this context, a complex system of discovering and penalizing such deviations would also have to be arranged. *Clark, supra.* There is no direct evidence of such a system; however, plaintiffs argue the alleged co-conspirators gave "mutual assurances" there would be no discounts. (10/19/87 Tr. at 109.)

there was not a conspiracy to set prices. (Defendants' Mem. at 24; Barber Tr. at 501–502.)

A Court may not determine the credibility of these witnesses or weigh the evidence offered by the parties. *Anderson*, 106 S.Ct. at 2513. Giving the benefit of all favorable inferences, and assuming the facts cited by both parties are true, the inferences of rational, independent conduct appear equal to those of concerted action. "It is not unlawful for a business to take the prices charged by its competitors into account when setting its own prices, or to follow or copy the prices of a competitor, if the decision to do so is the result of a unilateral business judgment, and not the result of collusive agreement." *Wilcox Development v. First Interstate Bank of Oregon*, 605 F.Supp. 592, 595 (D.Or.1985), *aff'd* 815 F.2d 522 (9th Cir.1987) (citing *United States v. International Harvester*, 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1927).) However, in this case the inferences of independent action in setting prices does not outweigh the evidence of an anticompetitive objective to enter the agreement. Accordingly, defendants' motion for summary judgment on the intent issue is denied.[21]

Plaintiffs claim "the issues of motive and intent need not be reached in order to grant summary judgment in favor of plaintiffs on liability on the issue of an anticompetitive effect on prices." (Plaintiffs' Mem. at 11, n. 20.) Thus, plaintiffs themselves have admitted that if summary judgment is to be granted in their favor it must be based entirely on the question of the effect of the information exchange on competition. Accordingly, plaintiffs' motion for summary

judgment concerning anticompetitive intent is denied.

### C. *Anticompetitive Effect*

Both parties in this case claim they are entitled to summary judgment as a matter of law based upon the effect of the information exchange on industry prices. The plaintiffs claim the business jet industry is oligopolistic and highly concentrated with price inelastic demand; therefore, they claim the reciprocal exchange of price information most likely has an anticompetitive effect and constitutes a *per se* violation of section one of the Sherman Act. *United States v. United States Gypsum*, 438 U.S. 422, 457–458, 98 S.Ct. 2864, 2883–2884, 57 L.Ed.2d 854 (1978); VI P. Areeda, *Antitrust Law*, ¶ 1407e at 35 (1986). (Plaintiffs' Mem. at 45.)

Conversely, the defendants contend the business jet industry is highly competitive and non-oligopolistic. They claim the reciprocal exchange of price information among competitors does not have an anti-competitive effect in this case because the alleged co-conspirators only exchanged publicly available list price information, and the manufacturers did not adhere to these prices in making sales of business jets. (Defendants' Mem. at 18, 30–32.) Moreover, the prices exchanged were base prices which would not account for the fact that each of the jets were different in terms of range, passenger capacity, fuel consumption and standard equipment. (Defendants' Mem. at 2.)

For the reasons set forth below, neither of the moving parties has sufficiently established their position with regard to the effect of the information exchange on com-

---

**21.** Granting summary judgment in an antitrust action is disfavored when issues of motive and intent are central to the case. *Poller v. CBS*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *But see, Anderson*, 106 S.Ct. at 2514; *Zenith v. Matsushita*, 513 F.Supp. at 1144. In granting summary judgment for the defendants in an extremely complex antitrust litigation, Judge Becker in *Zenith v. Matsushita*, noted

The number of antitrust cases the Supreme Court and courts in the Third Circuit have granted or upheld the grant of summary judgment on the merits, either partial or complete, since the *Poller* decision in 1962 is extremely

large. It is now settled that summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in extensive discovery, fail to produce "significant probative evidence" in support of the allegations in their complaint.

513 F.Supp. at 1140 (footnote omitted). In the instant action, where the plaintiffs have met their burden of proof to support the inference of an anticompetitive intent to exchange prices *Poller* does prevent the grant of summary judgment for defendants with respect to the intent issue.

petition as a matter of law without a genuine dispute over the material facts. The plaintiffs have failed to show that business jets are fungible goods. (See discussion of fungibility in sub-section 1, *infra.*) Therefore, their *per se* argument must be rejected, and their cross-motion with respect to the price-fixing claims must be denied. Questions of fact regarding the relevant product market of business jets, and the concentration of the business jet industry make it impossible to determine as a matter of law the effect of the information exchange on competition. Thus, the motions of both parties must be denied with respect to the effect of the information exchange.

### 1. Fungibility

Plaintiffs have misguidedly relied on two inapposite cases to support their argument that they are entitled to summary judgment because the exchange of price information in this case constitutes a *per se* violation of Section One of the Sherman Act. *United States Gypsum* affirmed a reversal by the Third Circuit of criminal convictions of several officials of major gypsum board manufacturers who had engaged in interseller price verification. 438 U.S. at 465, 98 S.Ct. at 2887. This is a practice whereby competitors would call each other to determine the actual price currently being offered by a competing seller to a particular customer. *Id.* at 429, 98 S.Ct. at 2869. Plaintiffs also draw support for their *per se* argument from the *Container* case wherein the Supreme Court in a five page opinion struck down a scheme in which a seller of corrugated containers, upon the request of another seller, would furnish information as to the most recent price charged or quoted to an individual customer. 393 U.S. at 338, 89 S.Ct. at 513. The Court found as a matter of law that this arrangement stabilized

prices in violation of Section One of the Sherman Act. *Id.* at 336–37, 89 S.Ct. at 512.

The plaintiffs have attempted to mold the instant facts into the holdings of *Gypsum* and *Container,* however both cases are distinguished from the instant case by the fact that gypsum board and corrugated containers are fungible goods. *Gypsum,* 438 U.S. at 426, 98 S.Ct. at 2868; *Container,* 393 U.S. at 337, 89 S.Ct. at 512. That is to say, the goods of competing manufacturers are virtually identical, so the primary, if not the only, source of competition among manufacturers is in price.

 Competition for sales of business jets occurs on a variety of levels of which price is only one. Range, passenger capacity and fuel efficiency are among the factors which business jet buyers take into consideration when purchasing an aircraft. (Plaintiffs' Mem. at 36; Defendants' Mem. at 14; Defendants' Reply at 12–13.) As well, it is difficult to make comparisons among different models of business jets because their characteristics vary widely. (Defendants' Reply at 14; Taylor Tr. 53–54; Roden Tr. 137; Handy Tr. 654–655, 664.) Thus, the plaintiffs concede business jet aircraft are not fungible. (Plaintiffs' Post–Hearing Summary Judgment Memorandum at 36.) Because business jets are not fungible products, an exchange of price information among manufacturers of business jets cannot be found to be a *per se* violation of Section One of the Sherman Act under the rules of either *Container* or *Gypsum.* Plaintiffs' cross-motion for summary judgment must be denied.[22]

The *Container* Court found:

the corrugated container industry is dominated by relatively few sellers. The product is fungible and the competition for sales is price. The demand is inelastic, as buyers place orders only for imme-

---

**22.** Courts subsequent to the *Container* case have distinguished its *per se* rule when the facts of the instant dispute do not fit the *Container* holding because the product is not fungible. *See Belliston v. Texaco, Inc.,* 455 F.2d 175, 181 (10th Cir.), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972); *Flav–O–Rich, Inc. v. North Carolina Milk Comm'n,* 593 F.Supp. 13, 15 (E.D.

N.C.1983). *Cf. L.C.L. Theatres, Inc. v. Columbia Pictures Industries,* 421 F.Supp. 1090, 1096 (N.D. Tex.1976), *aff'd,* 566 F.2d 494 (5th Cir.1978) (distinguishing *Container* where the product is *inter alia* not fungible). *See also* Note, *Antitrust Implications of the Exchange of Price Information Among Competitors,* 68 Mich.L.Rev. 720, 722 (1970).

diate, short-run needs. The exchange of price data tends toward price uniformity. For a lower price does not mean a larger share of the available business but a sharing of the existing business at a lower return.

393 U.S. at 337, 89 S.Ct. at 512. The *Container* case is plainly inapposite to plaintiffs' price fixing claims because in addition to the facts that business jets are not fungible, that competition for sales relies on many factors of which price is only one, and that there is evidence of competition over market shares, factual disputes exist concerning the number of sellers in the industry (see subsection 2, *infra*), and the elasticity of demand for business jets. Plaintiffs claim demand is inelastic (Plaintiffs' Mem. at 36; Barber Supplemental Report at 26–31), while defendants argue demand is elastic. (Defendants' Reply at 15–16.)[23] These disputes create a second ground upon which to reject plaintiffs' *per se* argument.[24]

### 2. Market Definition

Both of the parties have devoted considerable portions of their extensive submissions to forwarding contradictory definitions of the business jet industry. As stated, this is because the nature of the industry will often determine whether the exchange of information relating to price among competitors has an anticompetitive or procompetitive effect.

The anticompetitive effect of a price information exchange in an oligopolistic industry was discussed in the *Gypsum* case:

"Regardless of its putative purpose, the most likely consequence of any such [reciprocal] agreement to exchange price information would be the stabilization of industry prices.... Especially in oligopolistic industries, ... the exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions."

*Gypsum*, 438 U.S. at 457, 98 S.Ct. at 2883–2884.[25]

Plaintiffs offer evidence that the market for new business jets is a highly concen-

---

**23.** Elasticity is an economic concept reflecting the effect an increase in prices will have on the demand for a product. The concept of elasticity, like that of relevant market depends almost entirely upon the degree to which products are interchangeable. A product which is said to be price elastic has many substitutes. A slight increase in price of a price elastic product will result in a large drop in demand as customers begin to use the substitute product. Inelastic products do not have substitutes. An increase in price of an inelastic product will result in a relatively small drop in demand because most customers would rather use the product at a higher price than forego its use at all.

In this case, the elasticity of the business jet industry may depend upon the extent to which used business jets may be used for the same purposes as new business jets. If the two products are interchangeable, as defendants argue, (Defendants' Mem. at 28), then the demand for new business jets would most likely be price elastic; price increases for new business jets would simply compel purchasers to buy retrofitted used business jets. (*See* Adelman Report at 18–20.) The interchangeability of used and new business jet aircraft is one of the factual issues which cannot be resolved as a matter of law based on the evidence present in the record. Therefore, a determination of the demand elasticity of new business jets is impossible to make at this time.

**24.** Subsequent to the *Container* decision, the Supreme Court explicitly stated "the dissemination of price information is not itself a per se violation of the Sherman Act." *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975) (citing, *inter alia, Container*, 393 U.S. at 338, 89 S.Ct. at 513) (concurring opinion); *see also Gypsum* 438 U.S. at 441 n. 16, 98 S.Ct. at 2875 n. 16; *Zenith Radio v. Matsushita*, 513 F.Supp. at 1152–53. Therefore, if the *per se* rule of *Container* is to be followed, it must be closely tailored to the facts pattern of that case. *See Container*, 393 U.S. at 338, 89 S.Ct. at 513.

**25.** Plaintiffs' reading of *Gypsum* is strained when they argue that even in a non-oligopolistic market, the exchange of current and future prices constitutes a *per se* violation of section one of the Sherman Act. (Plaintiffs' Mem. at 57.) Plaintiffs cite *Gypsum*, 438 U.S. at 441, n. 16, 98 S.Ct. at 2875 n. 16, in support of their proposition. However, the passage they quote clearly states the exchange of current price information is "not *per se* unlawful" without a showing of an anticompetitive effect. *Id.* As will be shown, there is sufficient dispute of material fact on the issue of anticompetitive effect to preclude establishing a *per se* violation.

trated oligopoly. For one thing, the two government reports cited earlier define it as such. ITC Report at 5. ("[T]he general aviation industry is highly competitive.... The industry is also highly concentrated...."); (DOC Report at 22.) However, these are the same reports which show there is a high level of competition in the business jet industry. Therefore, based upon these reports alone there is a genuine issue of a material fact sufficient to reject the arguments offered by plaintiffs and defendants in support of their respective motions on the issue of anticompetitive effect. This is not the only disputed evidence, however. Substantial issues of fact also exist concerning the relevant product market.

The relevant product market definition [26] is important in this case because it will determine the level of concentration in the industry. Plaintiffs define the relevant product market in this case as sales of new business jet aircraft in the United States. (Plaintiffs' Mem. at 32.) For this market, the plaintiffs' economic expert, Richard Barber, shows that the Herfindhal–Hirschman Index ("HHI") and the four firm concentration ratio, both of which measure the concentration of relevant markets, are well above established guidelines for highly concentrated markets. (Plaintiffs' Mem. at 32.) The defendants, to the contrary, show that if sales of used business jets and resales of new business jets are included in the definition of relevant product market, then the HHI is well below 1000, which is the Justice Department's limit for unconcentrated markets. (Defendants' Reply at 28–29.)

Both parties have amply supported their competing definitions of the relevant product market with cites to evidence from the record and other authorities. For example, plaintiffs' economic expert relies upon the perceptions of the business jet manufacturers as evidenced by the type of information exchanged among them, their testimony, and their internal documents. (Plaintiffs' Mem. at 17; see Barber Supp. Report at 10–12.) Defendants rely primarily upon the relationship between prices of new and used business jets, as well as the perceptions of purchasers of business jets to establish that new and used business jets compete in the same market. (Defendants' Reply at 28–35.) Thus, both parties have offered probative evidence of their opposing definitions of the relevant product market.

Because the determination of the relevant product market in this case depends upon whether used business jets are reasonably interchangeable by consumers of new business jets for the same purposes,[27] and because both parties have offered evidence to support their positions, the determination of the relevant product market in this case is a finding of fact which cannot be determined on a summary judgment motion. *See Westman Commission Co. v. Hobart International, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986).

### 3. No Price Reductions Theory

Plaintiffs have shown there is a dispute over the material issue of whether the information exchange had an anticompetitive effect on price sufficient to preclude granting the defendants' motion. In considering defendants' motion, the court must believe all of the evidence of plaintiffs and draw all justifiable inferences of fact in their favor. *Anderson,* 106 S.Ct. at 2513. In this con-

---

**26.** In *United States v. E.I. DuPont De Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court states that in determining what constitutes a relevant market "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up" the relevant market. *Accord Rothery Storage and Van Co. v. Atlas Van Lines,* 792 F.2d 210 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *Hudson's Bay,* 651 F.Supp. at 834–835. The relevant market must be determined in terms of both product

and geographic markets. *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Plaintiffs claim the geographic market in this case is the United States. (Plaintiffs' Mem. at 32.) The defendants do not appear to dispute this issue, however they vigorously contend plaintiffs' definition of the relevant product market.

**27.** As well, the impact of resales of new business jets appears to be a consideration.

text, it must be assumed the relevant market for business jets is oligopolistic and highly concentrated. Although the exchange of current price information is not a *per se* violation of Section One the Sherman Act, it carries great "potential" for such a violation. *Gypsum*, 438 U.S. at 441, n. 16, 98 S.Ct. at 2875 n. 16. A mere potential violation of the Sherman Act, however, is not enough to permit the case to go to trial. The plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 106 S.Ct. at 1356.

The Barber and Laskow reports conclude that the exchanged prices were adhered to by the various manufacturers thereby stabilizing the price of business jet aircraft. Specifically, Mr. Barber shows that during 1979 to 1983 while demand for business jets dropped over 80%, business jet prices remained at a constant level. The Report of Mr. Laskow shows that this level was at or above the Falcon Jet list prices in the great majority of Falcon Jet sales. (Plaintiffs' Mem. at 61.) Therefore, plaintiffs conclude these reports together are highly probative of the fact that the exchange of price information had the effect, whether by tacit agreement or not, of stabilizing the price of business jets at a point far above demand.

The defendants have waged numerous attacks on the Barber and Laskow reports;[28] however, if the reports are found to be admissible evidence, then their factual assertions must be accepted as true, and this would provide sufficient evidence to suggest that the exchange of price information would have an anticompetitive effect in stabilizing business jet prices. Even if the reports are not found to be admissible, the plaintiffs claim they have established their proposition that the prices exchanged became the actual prices "in no less than five different ways." (Plaintiffs' Mem. at 9, 60.)

The defendants have also introduced the reports of their economic experts, Morris Adelman and Bruce Stangle. These reports show that prices actually dropped during the 1979–1983 slump in demand and that non-price discounts and inducements such as free option packages were also given. (Defendants' Mem. at 18.) Therefore, the contradictory expert reports of the parties create a genuine issue of material fact concerning whether there was an anticompetitive effect on prices. The summary judgment motion of defendants with respect to the issue of effect must be denied.

### D. *Damages and Standing*

Falcon Jet and AMB–BA have also argued for summary judgment on the price fixing claims in their favor because (1) plaintiffs cannot show they were injured by the exchange of price information among business jet manufacturers, and (2) plaintiffs do not have standing to assert their price-fixing claims with respect to all of the business jets purchased from Falcon Jet. The plaintiffs have not argued for summary judgment on the issue of damages.

### 1. Damages

▆▆▆▆▆ It is an essential element of any antitrust claim that the plaintiff demonstrate injuries of the type the antitrust laws were meant to protect. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–540, 103 S.Ct. 897, 908–910, 74 L.Ed.2d 723 (1983). In alleging antitrust damages, the plaintiffs have a lesser burden of proof than they do on the other elements of their claim. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Out Front Productions, Inc. v. Magid*, 748 F.2d 166, 169 (3d Cir.1984). Antitrust damage calculations need not be proven with certainty, *Zenith*, 395 U.S. at 123–124, 89 S.Ct. at 1576–1577. Moreover, plaintiffs have satisfied their burden with respect to the fact of damages if they demonstrate merely a "causal relationship" between defendants' illegal acts and plaintiffs' alleged injuries. *Out Front Productions*, 748 F.2d at 169; *Bogosian*, 561 F.2d at 454.

---

**28.** Defendants' Mem. at 32–37; Defendants' Reply at 17–25.

Defendants claim "[s]ummary judgment is appropriate because the opinion of plaintiffs' expert that the information exchange had an 'anti-competitive effect' lacks factual support in the record." (Defendants' Mem. at 41.) This argument not only ignores the relevant burdens of proof, but appears to be nothing more than an extension of defendants' previous attempts to discredit the expert report of plaintiffs' witness, Mr. Barber.

As to the fact of damages, the record demonstrates the Barber report is based upon a review of the contracts and exchanged prices of three of the alleged co-conspirators, and testimony from executive officers of the other companies that they adhered to their base prices. (Plaintiffs' Mem. at 61; see Plaintiffs' Mem. at 245, n. 59.) From this evidence, Mr. Barber finds (1) the prices exchanged were base prices (Barber Report at 22), (2) the business jet manufacturers adhered to the base prices in selling business jets (Barber Report at 26–29 [29]); and (3) the prices exchanged were the actual prices at which transactions were made. (Barber Report at 26.) The effect of the exchange, according to the Barber Report, was to "facilitat[e] stabilization [of prices] by providing each seller with knowledge that was not otherwise available and minimizing the risk of competitive price cutting." (Barber Report at 51.) Therefore, the Barber Report concludes that plaintiffs' injuries are equal to the percentage of the purchase price which they were overcharged as a result of the price stabilization of the information exchange.

Despite the asserted factual basis for Mr. Barber's conclusions, the defendants insist this report does not present significant probative evidence of an anticompetitive effect on prices because (1) Mr. Barber relied on improper evidence (Defendants' Mem. at 33), (2) Mr. Barber ignored relevant data (Defendants' Mem. at 34, 35), and (3) the evidence relied upon by Mr. Barber will also support conflicting interpretations. The defendants do not contend,

however, that the evidence relied upon by Mr. Barber does not support his conclusion.

These arguments are directed at the credibility of Mr. Barber's Report, and the merit of the "no price reductions" theory as persuasive evidence of an anti-competitive effect. Although an antitrust plaintiff may not be allowed to defeat a motion for summary judgment with an expert report that lacks factual support in the record, *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania*, 745 F.2d 248, 262 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985), the credibility of the evidence submitted should not be a factor in deciding a motion for summary judgment. *Anderson*, 106 S.Ct. at 2513. In the Third Circuit it is even disfavored to give careful scrutiny to the assumptions underlying and inferences made in an expert report when considering the admissibility of the report. *See, In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 279 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, Mr. Barber's reliance on the recorded contracts, price list comparisons and testimony of the alleged co-conspirators establishes sufficient probative evidence of a causal relationship between the defendants' acts and the plaintiffs' alleged injuries.

As to the amount of damages, defendants further object to Mr. Barber's damage calculation, which is based upon a comparison of isolated sales during the period when overcharges were incurred and post-complaint pricing behavior of the defendants. (Plaintiff's Mem. at 94.) From this comparison Mr. Barber concludes prices in the business jet industry were generally fifteen percent higher than they would have been under free competition and plaintiffs can claim damages of fifteen percent of the purchase price of the jets they purchased from Falcon Jet. (Barber Report at p. 59.) Defendants claim this damage calculation is "irrational," yet plaintiffs claim it is a common method of measuring the

---

**29.** Mr. Barber admitted in his deposition, however, that there was no express agreement among manufacturers to adhere to the exchanged prices. (Barber Tr. at 501–502.)

quantum of damages in an antitrust conspiracy case. (Plaintiffs' Mem. at 95–95.)

Given the low threshold for admissibility of expert reports in the Third Circuit, *see Japanese Electronic Products*, 723 F.2d at 279, and the minimal burden of proof for showing damages, *see Zenith*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9, even assuming defendants arguments are true, the arguments concerning damage calculation will not warrant granting summary judgment for defendants where plaintiffs have presented significant probative evidence of a causal relation of their injuries to defendants' acts.

### 2. Standing

The issue of damages is closely related to defendants' standing argument. Defendants challenge the standing of plaintiffs to assert their price-fixing claims as to certain business jets they purchased from Falcon Jet.[30] Specifically, defendants contend the standing of plaintiffs with respect to four contracts which were either cancelled or terminated, and four contracts which plaintiffs assigned to third parties who are not plaintiffs in this action. (Defendants' Reply at 61–62.)

As to the cancelled or terminated contracts, defendants are correct. Plaintiffs could not possibly have incurred overcharge damages on contracts which were never consummated. In cases where plaintiffs have made deposits on their contracts, the deposits were returned. (Defendants' Reply at 55.) Therefore, with respect to these contracts, plaintiffs have not established a "causal connection" of defendants' acts to plaintiffs' alleged injuries. It is interesting to note that although plaintiffs' opposition brief specifically lists the serial numbers of the Falcon Jet aircraft which were assigned to third parties, the aircraft contracts which were cancelled or terminated are referred to only as "a Gulfstream

IV aircraft" or "a Gulfstream III aricraft," suggesting plaintiffs never even knew the serial numbers of those aircraft. (Plaintiffs' Mem. at 83.) Moreover, plaintiffs' brief fails to address defendants' challenges with respect to these aircraft. Therefore, plaintiffs cannot be allowed to assert their price-fixing claims with respect to the three Gulfstream IV options terminated by plaintiffs and for which plaintiffs received a full refund of their deposit, or the purchase agreement for a Gulfstream III, aircraft which was cancelled and the downpayment on which was returned.

■ As to the contracts of which plaintiffs were assignors, defendants raise the issue of duplicative recovery. Defendants assert it is inconsistent to allow plaintiffs to assert "price fixing damages *both* for aircraft purchase agreements which they assigned *to* others and for aircraft purchase agreements which were assigned to them *from* others." (Defendants' Mem. at 45, emphasis in original.)[31] Defendants then assert "the assignees should be considered the 'direct purchasers' of aircraft with standing to sue for price-fixing damages under *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)." (Defendants' Mem. at 46). Specifically, the defendants contest the standing of plaintiffs to assert their price-fixing claims with respect to the purchase agreements for Falcon 20–404, Falcon 50–69, Falcon 50–87 and Gulfstream III s/n 426, all of which were assigned to parties not represented in this action.

The holding in *Illinois Brick* precludes indirect purchasers from bringing lawsuits alleging antitrust damages. *Id.* at 728–729, 97 S.Ct. at 2066. The *Illinois Brick* rule limits standing to assert price fixing claims to direct purchasers of the defendant's products. *Id.* at 729, 97 S.Ct. at 2066. The Supreme Court gave three reasons for this rule. First, the Court reasoned *Hano-*

---

**30.** Defendants do not claim that plaintiffs lack standing to assert their claims with respect to all of the aircraft they purchased from Falcon Jet. (Defendants' Reply at 60 ("Defendants have never challenged the standing of Rose Associates as a direct purchaser of Falcon 50–81....")). Therefore, the standing argument is really a question of whether plaintiffs can show they were injured through certain transactions.

**31.** The plaintiffs erroneously argue "[t]here is no issue of duplicative recovery, since no other plaintiff has sued." (Plaintiffs' Mem. at 28.)

*ver Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which held it is no defense in an action brought by a direct purchaser that the indirect rather than the direct purchasers were the parties injured by the antitrust violation, must apply equally to plaintiffs and defendants. *Illinois Brick*, 431 U.S. at 729, 97 S.Ct. at 2066. Second, the Court noted that to permit both indirect and direct purchasers to sue would subject the defendants to the risk of multiple liability for the same antitrust violation. *Id.* at 730, 97 S.Ct. at 2066. Finally, the Court noted "[t]he principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and output decisions 'in the real economic world rather than in the economist's hypothetical model.'" *Id.* at 731–732, 97 S.Ct. at 2067 (citing *Hanover Shoe*, 392 U.S. at 493, 88 S.Ct. at 2231.) Thus the Court decided direct purchasers, not indirect purchasers, should have standing to sue because if the plaintiff were an indirect purchaser, "[t]he demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." *Id.* at 732–733, 97 S.Ct. at 2068 (footnote omitted). These calculations would be prohibitively complex; therefore, the antitrust laws are better served by allowing direct purchasers to recover fully for the defendant's overcharges. *Id.* at 735, 97 S.Ct. at 2069; *see, also Gregory Marketing v. Wakefern Food Corp.*, 787 F.2d 92, 94 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

Standing in this case rests upon whether the plaintiffs or their subsequent assignees were the direct purchasers of the aircraft. The record demonstrates that the assign-ments to the non-plaintiffs were independently negotiated between plaintiffs and their customers. (Plaintiffs' Mem. at 86–87.) For example, Rosefield & Gitomer[32] purchased Falcon 20–404 from Falcon Jet on December 26, 1978 for a total price of $4,119,606. (PX–113.) The date of delivery was scheduled for November 1979. (*Id.*) Falcon 20–404 was later assigned to E.L. Cox on July 14, 1979 for $4,250,000 plus the cost of optional equipment and interest. (DX–628.) The price paid by Cox was not only more than that paid by Rosefielde & Gitomer, it was below the typical purchase price of $4,665,000 for a new Falcon 10F, as reported in the Falcon Jet internal pricing documents at that time. (PX–252, p. 9.) Therefore, if standing to sue were given to E.L. Cox rather than the plaintiffs, all of the difficulties inherent in the pass-on defense would squarely be raised in an attempt to trace the amount of overcharges passed on from Rosefielde & Gitomer to E.L. Cox.[33]

The fact Rosefielde & Gitomer charged E.L. Cox a higher price for the aircraft is not a reason to deny plaintiffs standing. As defendants argue, the Supreme Court in *Matsushita* stated that competitors could not recover damages for a conspiracy to raise prices artificially because competitors would "stand to gain from any conspiracy to raise the market price...." 106 S.Ct. at 1354. (Defendants's Reply at 57.) However, this reading of *Matsushita* does not apply to the plaintiffs in this case because they are not asserting their price-fixing claims as competitors, but as purchasers.

In *Hanover Shoe*, the Supreme Court directly addressed the issue of purchasers who compensate for artificially high prices by reselling their goods at even higher prices. In that case, the Supreme Court held, "the buyer is equally entitled to dam-

---

**32.** Rosefielde & Gitomer was a law firm which dissolved prior to the commencement of this action. (Plaintiffs' Mem. at 84.) Mr. Rosefielde, a plaintiff, was a partner in that firm and is the successor in interest to those parts of the Rosefielde & Gitomer business that dealt with business jet aircraft. (Plaintiffs' Mem. at 84, citing Rosefielde Affidavit, ¶ 1.) Therefore, Mr. Rosefielde will have standing to sue for any aircraft assigned by Rosefielde & Gitomer.

**33.** The assignment to E.L. Cox does not fit within the narrowly defined exception to the rule of *Illinois Brick* which permits an indirect purchaser to sue when its purchase is made pursuant to a pre-existing, cost-plus contract. *See Illinois Brick*, 431 U.S. at 736, 97 S.Ct. at 2070; *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573 (3d Cir.1979).

ages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits will be greater were his costs lower...." *Hanover Shoe*, 392 U.S. at 489, 88 S.Ct. at 2229; P. Areeda, *Antitrust Law*, ¶ 337c p. 186 (1978). Thus, defendants' contention that "[i]f plaintiffs bought high, they sold their contracts at an even higher price" may create an issue of fact concerning the quantum of damages suffered by plaintiffs, but it is not a reason to deny plaintiffs standing.

Defendants' motion for summary judgment cannot be granted on the theory that plaintiffs do not have standing to assert their price fixing claims with respect to Falcon 20–404, Falcon 50–69, Falcon 50–87, or Gulfstream III s/n 426.

## II. Count Seventeen

■ The first essential element of plaintiffs' antitrust claim is an agreement among would-be competitors. Section One of the Sherman Act prohibits only a "contract, combination ..., or conspiracy in restraint of trade." 15 U.S.C. § 1. An agreement can be shown directly, or through inference from circumstantial evidence; however, if the plaintiff can provide only circumstantial evidence, it must tend " 'to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 106 S.Ct. at 1357 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471). Independent action, no matter how egregious the restraint of trade, no matter how reprehensible the motivation, simply does not constitute a violation of the antitrust laws. *See Fragale & Sons*, 760 F.2d at 473.

■ With respect to count seventeen, although plaintiffs can show each of the four alleged conspirators took significant steps to deter the resale of new business jets, an anticompetitive objective under the Sherman Act, the plaintiffs cannot show these manufacturers acted pursuant to an agreement or conspiracy. Therefore defendant's motion for summary judgment

with respect to count seventeen must be granted.

The plaintiffs direct their second antitrust claim at four business jet manufacturers: Falcon Jet, British Aerospace, Gates Learjet Corporation and Cessna Aircraft Company. All of these companies attempted to deter the resale of new business jets through severely restricting the assignability of purchase agreements or the transferability of warranties to third parties. Each manufacturer admits the purpose and effect of these policies was to deter or prevent competition from "speculators," such as the plaintiffs in this case, who would purchase new business jets and resell the delivery contracts to customers in the new business jet market. (Plaintiffs' Mem. at 38.) Oftentimes, speculators could make substantial profits in short periods of time by taking advantage of the sharply rising prices of business jets during the early 1980's. (*See e.g.*, Defendants' Reply at 57.)

The record substantiates plaintiffs' allegations that each of the four aircraft manufacturers took significant steps to deter competition from speculators; however, as the plaintiffs admit, the four alleged co-conspirators "attempted to prevent or impede resales by a variety of methods." (Plaintiffs' Mem. at 38.) For example, while Falcon Jet, British Aerospace and Gates Learjet incorporated "right of first refusal" clauses into their contracts, Cessna used a reassignment clause that it rarely enforced. (Plaintiffs' Mem. at 97–98; DX–16.) Prior to 1981, Gates Learjet charged $125,000 for a warranty transfer. After 1981, Gates Learjet made the contract non-assignable until six months after the buyer accepted delivery of the aircraft and retained the right of first refusal. (DX–16.) After 1982, Falcon Jet charged four percent of the purchase price of the aircraft to assign a contract and warranty, or one percent to transfer the warranty only. (PX–54.) British Aerospace charged from $10,000 to $50,000 to assign a contract but neither British Aerospace nor Cessna ever charged to transfer a warranty. (DX–16; Defendants' Mem. at 48–49.)

Although Falcon Jet, Gates Learjet, British Aerospace and Cessna all adopted policies designed to prevent the resale of new business jet contracts, inferences of conspiracy made from ambiguous evidence of consciously parallel business behavior cannot be made without the existence of certain "plus factors". *Apex Oil*, 822 F.2d at 253.

A high level of interfirm communications is one of the "plus factors" which may indicate the defendants were engaged in collusive anticompetitive behavior. *See In re Plywood Antitrust Litigation*, 655 F.2d 627, 634 (5th Cir.1981), *cert. dismissed* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983). Presumably in an attempt to show a high level of interfirm communications, plaintiffs claim business jet manufacturers discussed the subject of resales and how to prevent them on numerous occasions. (Plaintiffs' Mem. at 102.) There are only two sources of evidence for this claim. First, plaintiffs point to notes taken at "forecasting meetings" of business jet manufacturers. (*e.g.* PX 1309, PX 835 p. 5, PX-1346.) The topic of speculators was discussed at forecasting meetings in Dallas on June 14, 1982 and in Washington D.C. on October 22, 1982. (PX-144A, B.) However, as the notes taken at these meetings show, the manufacturers in attendance [34] could only agree upon the fact that speculators existed. There was anything but agreement as to what should be done about them, or even whether they were beneficial or harmful to the industry. In fact, Mitsubishi and Canadair "were encouraging speculation in order to build their order books for their stockholders." (PX-151 pp. 4-5; Bergstron Tr. 154-157; Defendants' Mem. at 48.)

Second, plaintiffs point to surveys conducted by L.E.S. Tuck of British Aerospace in 1981, and Corwin Meyer, former president of Falcon Jet, in 1982. The Tuck survey was conducted in the Fall of 1981 for the purpose of finding out how many aircraft sold by competitors of British Aerospace were up for resale. (Plaintiffs' Mem. at 41.) Mr. Tuck obtained this information from his sales engineers who had contacted British Aerospace competitors. (*Id.*) On the basis of his findings, Mr. Tuck learned that Lear used warranty transfer fees and right of first refusal clauses to deter resales and recommended that British Aerospace adopt policies similar to those of Lear. (PX 1310; Plaintiffs' Mem. at 41, 99.)

Mr. Meyer's survey in May, 1982 involved direct contact with senior executives of most of Falcon Jet's competitors. (Plaintiffs' Mem. at 40.) Specifically, Mr. Meyer contacted his competitors to discuss their policies with respect to deterring resales. *Id.*[35] He set forth the results of his survey in a letter to his successor as president of Falcon Jet, Frank Wisekal. (DX-16.)

The plaintiffs claim these communications indicate Falcon Jet was engaged in a conspiracy to deter business jet resales. To the contrary, the record demonstrates that the Meyer and Tuck surveys were commenced because of unfamiliarity with competitors' policies. Mr. Meyer's letter clearly states the survey was commenced in response to "pressure from our customers who wanted to liquidate their excess aircraft after the recession started, and asked us to help them eliminate this onerous contract clause...." DX-16, p. 1. The letter goes on to suggest Falcon Jet had even lost customers as a result of their policies. DX-16, p. 2.

Despite the allegation that only four manufacturers participated in the conspiracy, none of the evidence proffered by plaintiffs shows *only* Falcon Jet, British Aerospace, Gates Learjet and Cessna communicated about transfer and assignment policies. Rather, the evidence presented shows that communications among business jet manufacturers concerning "specu-

---

**34.** Falcon Jet did not attend these meetings, but received copies of the notes from participants at the meetings. (Plaintiffs' Mot. at 42, no. 81.)

**35.** Mr. Meyer has denied the existence of the alleged conspiracy in a sworn affidavit (Corwin H. Meyers Aff., ¶ 5), as have the other alleged co-conspirators. (Defendants' Reply at 65, n. 82.)

lation" consistently involved non-conspirators. For instance, Mr. Meyer contacted Gulfstream American, Westwind, and Canadaire in addition to the three alleged co-conspirators to conduct his survey. Similarly, Mr. Tuck included information gathered from Westwind in his survey. (PX-1309.) Additionally, the forecasting meetings were attended by all business jet manufacturers, except Falcon Jet. It is unlikely the four alleged co-conspirators would routinely discuss warranty transfer policies with competitors who are not alleged to be members of the illegal conspiracy.

The only evidence of a conspiracy among the four alleged co-conspirators is their common desire to deter business jet resales. This evidence is insufficient to meet the plaintiffs' burden of proof under the *Monsanto* standard. *See* 465 U.S. at 764, 104 S.Ct. at 1471. Drawing all inferences of fact in their favor, the documentary evidence introduced by plaintiffs is barely sufficient to draw the inference of consciously parallel business behavior among the four alleged co-conspirators. Moreover, plaintiffs have not presented evidence which tends to exclude the possibility that Falcon Jet, British Aerospace, Gates Learjet and Cessna acted independently in designing their policies to deter the resale of new business jets. Because plaintiffs have failed to present evidence of any concerted action on the parts of the alleged co-conspirators, an essential element of their claim, the defendants' motion for summary judgment with respect to count seventeen is granted. *Celotex Corp.*, 106 S.Ct. at 2553.

SO ORDERED.